**08  CIV  3868**



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

SECURITIES AND EXCHANGE COMMISSION, :

    Plaintiff,

        v.

MARC J. GABELLI, and
BRUCE ALPERT,

        Defendants.

---

**ECF CASE**



## COMPLAINT

Plaintiff Securities and Exchange Commission ("Commission") alleges the following against defendants Marc J. Gabelli and Bruce Alpert ("Defendants"):

### SUMMARY

1.    From 1999 to 2002, Marc Gabelli, the portfolio manager of the Gabelli Global Growth Fund ("GGGF" or "the Fund"), authorized GGGF to be market timed, or "scalped," by Headstart Advisers Ltd. ("Headstart"), known during the relevant period as Folkes Asset Management.  Starting in April 2000, Marc Gabelli authorized Headstart to significantly increase the amount of money it was using to market time GGGF in exchange for a "sticky asset" investment in a hedge fund he managed.  Defendant Bruce Alpert, the Chief Operating Officer of Gabelli Funds (GGGF's adviser) and head of the market timing police, knew that Headstart was frequently trading in GGGF and allowed it to continue.  After learning that Headstart had made a *quid pro quo* investment in

exchange for its market timing capacity, Alpert approved the continuation of Headstart's timing.

2.      By approving Headstart's market timing, defendants Marc Gabelli and Alpert knowingly or recklessly caused substantial harm to the Fund.  The three accounts used by Headstart to market time GGGF during the relevant period earned internal rates of return of 185 percent, 160 percent, and 73 percent, respectively.  Over the same period, the rate of return for long-term investors in GGGF was no more than negative 24.1 percent.  The annual dilution caused by the market timing ranged from approximately one percent to four percent of GGGF's assets.[1]

3.      From September 1999 to September 2002, Headstart executed 863 trades, or approximately 399 roundtrips, in GGGF with an aggregate dollar value of approximately $4.2 billion.  From January 1, 2000 through June 30, 2002, Headstart's market-timing activity accounted for approximately 62 percent of the dollar value of all trading in GGGF.

4.      At the same time that the Defendants were allowing Headstart to market time GGGF, Gabelli Funds, under Alpert's direction, was prohibiting other market timers from trading in GGGF based on language in GGGF's prospectus which gave the Fund the right to "reject any purchase order if, in the opinion of the Fund management, it is in the Fund['s] best interest to do so."  In fact, Alpert made a presentation to the Fund's Board of Directors (the "Board"), in Marc Gabelli's presence, explaining that market timing was detrimental to mutual funds and describing how Gabelli Funds was taking steps to exclude market timers from the Fund.  However, neither Alpert nor Marc Gabelli

---

[1]      Dilution is a measure of the harm suffered by long-term investors due to market timing.

disclosed to the Board that Headstart was engaging in market-timing activity in GGGF.

Indeed, neither Alpert nor Marc Gabelli disclosed to the Board, at that time or any other

time during the relevant period, the market-timing arrangement with Headstart, the fact

that Headstart's investment in Marc Gabelli's hedge fund was made in exchange for

increased market-timing capacity, or the detrimental effects of Headstart's market timing

on GGGF shareholders.

     5.    In September 2003, Alpert wrote a memorandum, which was placed on

Gabelli Funds' parent company's website, in response to the New York Attorney

General's public announcement of its market timing investigations. The memorandum

was designed to assuage public investors' concerns that Gabelli Funds might have a

market-timing problem but failed to disclose material facts about Headstart, the sole

authorized market timer in GGGF, and gave the misleading impression that any failure to

exclude market timers was the result of procedural limitations rather than the intentional

conduct of the Defendants.

     6.    By engaging in the conduct described in the Complaint, Defendants Marc

Gabelli and Alpert aided and abetted violations of Sections 206(1) and 206(2) of the

Investment Advisers Act of 1940 ("Advisers Act"); and Defendant Alpert violated

Section 17(a) of the Securities Act of 1933 ("Securities Act") and Section 10(b) of the

Securities Exchange Act of 1934 ("Exchange Act") and Exchange Act Rule 10b-5.

     7.    Accordingly, the Commission seeks: (a) entry of permanent injunctions

prohibiting the Defendants from further violations of the relevant provisions of the

Advisers Act, the Securities Act, the Exchange Act and the rules promulgated thereunder;

(b) disgorgement with prejudgment interest; (c) the imposition of a civil penalty against

each Defendant due to the egregious nature of their violations; and (d) any other relief
this Court deems necessary and appropriate under the circumstances.

## JURISDICTION AND VENUE

8.      This Court has jurisdiction over this action pursuant to Sections 209 and
214 of the Advisers Act [15 U.S.C. §§ 80b-9, 80b-14]; Sections 20 and 22 of the
Securities Act [15 U.S.C. §§ 77t, 77v]; and Sections 21 and 27 of the Exchange Act [15
U.S.C. §§ 78u, 78aa].  The Defendants, directly or indirectly, made use of the means or
instrumentalities of interstate commerce, or of the mails, or the facilities of a national
securities exchange in connection with the transactions, acts, practices and courses of
business alleged herein.

9.      Venue is proper in this district pursuant to Section 214 of the Advisers Act
[15 U.S.C. § 80b-14], Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)]; and
Section 27 of the Exchange Act [15 U.S.C. § 78aa], because some of the alleged
transactions, acts, practices, and courses of business occurred in the Southern District of
New York.

## DEFENDANTS

10.     Marc J. Gabelli, 40, resides in Greenwich, Connecticut.  He was the
portfolio manager for GGGF and its predecessor fund from 1997 until early 2004 and
was primarily responsible for the management of GGGF during the relevant period.  He
also managed several Gabelli-affiliated hedge funds.  Since early 2004, Marc Gabelli has
not had responsibility for GGGF and he ceased working for Gabelli Funds as of January
1, 2006.  Marc Gabelli owns approximately 5 percent of the company that is the majority
owner of Gabelli Funds' publicly-traded parent corporation.  He is the son of the founder

4

of the Gabelli complex of funds and is friends with Najy N. Nasser ("Nasser"),

Headstart's Chief Investment Adviser. Marc Gabelli is currently the Chairman of the

Board of a publicly-traded company.

11.    Bruce Alpert, 56, resides in Westhampton Beach, New York. He has been

the Chief Operating Officer of Gabelli Funds since 1988 and Gabelli Funds' principal

executive officer since 2003. During the relevant period, Alpert's principal

responsibilities were operational and related to fund governance. Alpert received a CPA

license from the state of New York in 1977.

### RELATED PARTIES

12.    Gabelli Funds LLC ("Gabelli Funds"), a New York limited liability

company located in Rye, NY, is an investment adviser within the meaning of Section

2(a)(20) of the Investment Company Act and Section 202(a)(11) of the Investment

Advisers Act. It is the investment adviser to GGGF.

13.    GGGF is an open-end investment company registered under the

Investment Company Act. Until January 13, 2000, GGGF's name was the Gabelli Global

Interactive Couch Potato Fund. The Fund's name changed again on November 16, 2005

to GAMCO Global Growth Fund. During the relevant period, the Fund offered three

classes of shares and invested primarily in common stocks of foreign and domestic

issuers located in at least three countries. Its primary investment objective was to provide

investors with appreciation of capital. During the relevant period, the Fund disclosed that

it invested approximately 36 to 57 percent of its total assets in non-North American

securities and had net assets ranging from approximately $100.2 million to $563 million.

## STATEMENT OF FACTS

### Background

14.    A mutual fund is an investment company that pools money from many
investors and invests those funds in stocks, bonds, short-term money market instruments,
or other securities.  Mutual fund investors purchase their shares directly from the fund
itself or through a broker for the fund.  Millions of Americans have chosen to invest in
mutual funds as their primary method for saving for education, retirement, and other
financial goals.  Approximately half of all U.S. households own mutual fund shares.

15.    Mutual funds are meant to be long-term investments and were primarily
designed for buy-and-hold investors.  Nevertheless, some investors attempt to trade in
and out of mutual funds in order to exploit inefficiencies in the way funds value their
shares.  This strategy can be successful because many mutual funds use "stale" prices to
calculate the value of the securities held in their portfolios.  These prices are stale because
they do not necessarily reflect the "fair value" of such securities at the time the shares are
valued.

16.    As a general rule, mutual funds are priced once a day, usually at 4:00 p.m.
EST, when the New York Stock Exchange closes.  The price, known as the Net Asset
Value ("NAV"), generally reflects the closing prices of the securities that comprise a
given fund's portfolio, plus the value of any cash that the fund manager maintains for the
fund.  Unlike stock, the price of a mutual fund does not change during the course of the
day.  Instead, a mutual fund always fills the buy and sell orders it receives at the next
available NAV.  Accordingly, orders placed at any time during the trading day up to the

6

4:00 p.m. cutoff are executed at that day's NAV, but an order placed after the close of

trading is executed at the next day's NAV.

      17.    Market-timing traders attempt to take advantage of mutual funds' pricing

inefficiencies in a number of ways. One strategy is known as "time-zone arbitrage," a

practice that takes advantage of stale pricing in mutual funds like GGGF that hold

international stocks. For example, a U.S. mutual fund may hold shares of a Japanese

company traded on the Tokyo Stock Exchange ("TSE"). Because of the time-zone

difference, the TSE may close at 2:00 a.m. EST. If the U.S. mutual fund uses the TSE

closing price for the Japanese company's stock to calculate the mutual fund's NAV at

4:00 p.m. EST, that fund's NAV will be based, at least partially, on market information

that is fourteen hours old. Positive market movements during the New York trading day,

which will later cause the Japanese market to rise when it opens at 8 p.m. EST, will not

be incorporated into the fund's NAV, thereby causing the NAV to be artificially low. On

such a day, a trader who buys the U.S. fund at the artificially low or "stale" price can

realize a profit the next day by selling the U.S. fund's shares. Gabelli Funds has referred

to the practice of time-zone arbitrage as "scalping."

      18.    Market timing has a negative effect on long-term mutual fund

shareholders because it captures an arbitrage profit that comes dollar-for-dollar out of the

pockets of the long-term mutual fund shareholders. Essentially, market timing allows the

trader to step in at the last moment and take part of the long-term shareholders' upside

when the market goes up, so the next day's NAV is reduced for those shareholders who

remain in the fund. If the trader sells on days when the market goes down, the arbitrage

has the effect of making the next day's NAV lower than it would otherwise have been, thus magnifying the losses that long-term shareholders experience in a falling market.

19.    Beyond profiting from inequitable transfer of wealth associated with market timing, market timers also harm mutual fund shareholders in a number of other ways. For example, because most market-timing purchases are followed by sales, or redemptions, the next business day or shortly thereafter, in order to lock in the gain from pricing inefficiencies, they impose additional transaction costs, such as trading commissions, on the long-term shareholders and can also force the mutual fund to keep excess cash on hand that would otherwise be more profitably invested. Moreover, trades necessitated by such short-term sales can cause the mutual fund to realize losses or taxable capital gains at undesirable times and increase the tax bill for long-term shareholders. Market-timing transactions may also force mutual fund managers to buy stock as it is going up in price or sell it into a falling market. In short, while market timers profit from engaging in frequent short-term trading of mutual fund shares, the costs associated with such trading are borne by unsuspecting long-term investors.

**The Defendants' Market-Timing Agreement**

20.    In the summer of 1999, Marc Gabelli, GGGF's portfolio manager, met Nasser at a hedge fund conference. Shortly thereafter, beginning in September 1999, Marc Gabelli authorized Headstart to market time GGGF. Initially, Headstart market timed GGGF using $5 million from two separate accounts and identified these accounts to a Gabelli Funds employee who notified Marc Gabelli. Sometime between September 1999 and April 2000, Alpert informed Nasser of the "ground rules" including that Headstart's trading would not be acceptable in any fund other than GGGF. The two also

discussed the nature and frequency of Headstart's trading. By April 2000, Headstart's market-timing trades in GGGF had grown to over $7 million.

21.     On April 7, 2000, Marc Gabelli agreed to permit Headstart to increase its timing capacity to $20 million, which was about four percent of GGGF's assets at that time, in exchange for a $1 million investment by Headstart in a hedge fund Marc Gabelli also managed. Headstart opened a separate account for the additional $13 million in timing capacity and notified Marc Gabelli that it had done so.

22.     On April 17, 2000, Nasser emailed Marc Gabelli stating that he had organized the increase in market-timing capacity "which should be implemented on Monday [April 24]" and that he was "looking forward to doing something on [Marc Gabelli's] Hedge Fund especially in the spirit of cooperation which I think we have and are developing. I understand inflows would have a greater value for you businesswise now, near the beginning."

23.     The following day, April 18, Nasser emailed Marc Gabelli informing him that Headstart anticipated confirming its investment of approximately $1 million in the Marc Gabelli-managed hedge fund by Monday, April 24. On April 25, the day after the increase in Headstart's GGGF timing capacity to $20 million was to be implemented, Headstart notified Marc Gabelli that it had transferred $1 million for investment in the hedge fund. At that time, Headstart's investment in Marc Gabelli's hedge fund constituted approximately four percent of that hedge fund's assets.

24.     From April 2000 until the spring of 2002, Headstart regularly market timed between $15 million and $20 million in GGGF. The three accounts Headstart used

during that time comprised approximately four percent to 15 percent of the assets of GGGF.

25.    On or around April 1, 2002, Alpert instructed Headstart to reduce its market-timing activity. Alpert reduced Headstart's timing because Headstart was trading in amounts that violated federal law. The following day, Marc Gabelli sent an email to Alpert: "WHAT IS THE SITUATION WITH MARKET TIMER – I UNDERSTAND YOU TOLD HIM "I SAID" IT WAS OK. . . . VERY PAROCHIAL AND DESTRUCTIVE." (emphasis and ellipsis in original). Alpert replied:

> I have always been opposed to the market timers in the fund. I had a discussion with Naji Nassar that he should reduce his market timing activity to no more than 3% of the fund. He was reluctant to do this except he reduced one account to 3% and still is using about 10% or $16 million. I would like him out completely. However, If he continues his participation in other products of the firm we should allow some monies to remain in the Mutual funds.

26.    Shortly after being instructed to reduce its market timing, Headstart redeemed a portion of its investment in Marc Gabelli's hedge fund. Marc Gabelli later explained in an email that the redemption occurred because Headstart "was reduced in mkt timing money in mutual funds."

27.    Although Gabelli Funds reduced Headstart's market-timing capacity, Marc Gabelli and Alpert continued to allow Headstart to market time GGGF.

28.    On August 7, 2002, the CEO of Gabelli Funds' parent company gave instructions to stop all market timers playing "the international game." Alpert informed Headstart the same day that it would be permitted no further purchases in GGGF, and that a new account that Headstart had set up would not be allowed to trade in GGGF. Shortly thereafter, Headstart redeemed its remaining investment in Marc Gabelli's hedge fund.

29.    During the relevant period, Gabelli Funds received an advisory fee from GGGF, computed daily and paid monthly, at the annual rate of 1.00% of the Fund's average daily net assets. Gabelli Funds' affiliate also received management fees based on Headstart's investment in the Marc Gabelli-managed hedge fund.

**The Adviser Banned Other Market Timers**

30.    In its prospectus, GGGF reserved the right to "reject any purchase order if, in the opinion of the Fund management, it is in the Fund['s] best interest to do so." Beginning at least as early as December 2000, Gabelli Funds applied this provision to exclude identified market timers in GGGF and the other global funds, but continued to allow Headstart to market time GGGF.

31.    On December 15, 2000, Alpert wrote an internal memo to the file which stated that "Market Timers (scalpers) have been using the International and Global Funds in a way that is disruptive to the Fund and the management of the portfolio. We are making efforts to identify each account and restrict them from purchasing the funds." Beginning about the same time, Alpert instructed two Gabelli Funds employees to review purchases in the global funds and reject purchases that appeared to be market timing. For the next two years, these employees acted as "market timing police," examining purchases that Alpert, Gabelli Funds' CFO, or a trading desk employee identified for review. If it appeared that the purchase was a timing trade or the account was involved in other market-timing activity, the purchase would be rejected or the account banned from making future purchases.

32.    In a December 2000 email to Gabelli Funds' CFO, Marc Gabelli himself directed that a new market timer be banned from trading in GGGF. In doing so, he made clear that any timing allowed in GGGF would be "only what I authorized."

33.    Although other market timers were restricted or banned, the two employees who monitored for market timers were specifically directed to leave Headstart's accounts alone because "it was a Marc Gabelli-client relationship." At least one of the employees was given this instruction by Alpert.

34.    When a purchase was rejected or an account banned, Gabelli Funds would send a letter to the broker whose customer originated the trade. A typical letter contained language stating that the purchase was being rejected or the customer banned for "market timing" activity and referred to the Fund's prospectus as the grounds for doing so. The letters also stated that market timing could harm the Fund: "Market timing can negatively affect the mutual fund investment process. Excessive and unpredictable trading hinders a fund manager's ability to pursue the fund's long-term goals. . . . We regret the need to place this restriction, but we feel it is in the best overall interest of the Fund's shareholders."

35.    Gabelli Funds thus rejected market-timing purchases in at least twelve mutual funds totaling at least $58 million and also banned at least 150 accounts prior to August 31, 2002. During this same period, at least 48 accounts were banned from trading in GGGF and purchases totaling at least $23 million -- nearly half of the total value of rejected purchases -- were rejected from GGGF. The average size of a rejected purchase was approximately $279,000 and Gabelli Funds reviewed trades as small as $100,000. In contrast, Headstart was frequently trading in amounts up to $20 million in GGGF, but its

trades were not blocked or reviewed. In fact, Alpert assured Nasser during this period
that Headstart's accounts would not be blocked.

**Misstatements Made to the GGGF Board of Directors**

36.     On February 21, 2001, Alpert attended a GGGF Board meeting and
reported to the Board regarding "market timing" or "scalping" in global funds, its harm to
the funds, and efforts Gabelli Funds was undertaking to combat it, in terms similar to
those contained in his December 15, 2000 internal memorandum. However, Alpert did
not disclose that Headstart was being permitted to market time GGGF.

37.     Marc Gabelli attended the February 21, 2001 Board meeting. Immediately
after Alpert's report on market timing, Marc Gabelli reported on the operations of GGGF.
However, Marc Gabelli failed to disclose either Headstart's market-timing activity or the
"sticky asset" arrangement.

38.     Despite the representations to the Board about measures taken to restrict
market timers and Gabelli Funds' *de facto* policy to reject market-timing purchases, Marc
Gabelli and Alpert continued to allow Headstart's market timing while excluding other
market timers from GGGF. In addition, neither Alpert nor Marc Gabelli disclosed to the
Board, at that time or any other time during the relevant period, that Headstart was
engaging in market-timing activity in GGGF, the market-timing arrangement with
Headstart, the fact that Headstart's investment in the hedge fund Marc Gabelli managed
was made in exchange for increased market-timing capacity, or the detrimental effects of
Headstart's market timing on GGGF shareholders.

**Market Timing Harmed GGGF and Its Shareholders**

39.    Headstart's internal rates of return on the three accounts it used to time GGGF from 2000 to 2002 were approximately 185 percent, 160 percent, and 73 percent, respectively. During the same time period, GGGF's rate of return—the rate of return realized by long-term investors—was at most negative 24.1 percent. Headstart's total profits from market timing were approximately $9.7 million.

40.    From September 1999 to September 2002, Headstart executed 863 trades, or approximately 399 roundtrips, in GGGF with an aggregate volume of approximately $4.2 billion. From January 1, 2000 through June 30, 2002, its market-timing activity accounted for approximately 62 percent of the dollar value of all trading in GGGF.

41.    On 115 separate days, GGGF's sale of shares to Headstart totaled more than three percent of GGGF's shares; on 83 of those days the sales totaled more than five percent, and on 11 of those days the sales exceeded ten percent of GGGF's shares. These excessive sales caused GGGF to violate federal securities laws. Marc Gabelli and Alpert knew, or were reckless in not knowing, that the large sales to Headstart were causing the Fund to violate the law, but nonetheless allowed them to continue.

42.    Marc Gabelli and Alpert knew, or were reckless in not knowing, that GGGF was being harmed. Information on Headstart's and all other trading in GGGF was available to, and was in fact reviewed by, Marc Gabelli and Alpert. Indeed, Marc Gabelli was specifically notified on at least two occasions that the "market timer" was "coming back into" or "entering" GGGF. Further, in July 2001, Alpert redeemed his personal holdings in GGGF, after telling a Gabelli officer that he intended to do so because Marc Gabelli was allowing GGGF to be scalped.

**Alpert's Misleading Disclosures Regarding the Market Timing**

43.    On September 3, 2003, the New York Attorney General announced it was investigating market timing in mutual funds. This announcement led to a series of press releases by Gabelli Funds and an internal investigation.

44.    In a memorandum dated September 3, 2003, addressed to the mutual fund directors and posted on Gabelli Funds' parent company's website on or around that date, Alpert wrote that a number of steps had been put in place to discourage "scalping," including that

> for more than two years, scalpers have been identified and restricted or banned from making further trades. Purchases from accounts with a history of frequent trades were rejected. Since August 2002, large transactions in the global, international and gold funds have been rejected without regard to the past history. While these procedures were in place they did not completely eliminate all timers.

45.    Alpert knew, or was reckless in not knowing, that the statements contained in the September 3, 2003 memorandum were materially misleading. That memorandum made no mention of Headstart's trading – clearly known to and approved by Alpert – and misleadingly stated that scalpers had been restricted for more than two years. Moreover, the memorandum was misleading in that it created the false impression that Gabelli Funds was attempting to identify and ban all scalpers and frequent traders in its efforts to combat market timing in its funds. The release was designed to reassure investors and the Board that Gabelli Funds did not have market-timing problems similar to those being investigated by the New York Attorney General. However, it failed to disclose material facts about Headstart, the sole authorized market timer in GGGF, and gave the misleading impression that any failure to exclude market timers was the result of procedural limitations rather than the intentional conduct of the Defendants.

**Defendants' Fraud Remained Concealed Until at Least Late 2003**

46.    The Commission did not discover the Defendants' illegal conduct until late 2003, at the earliest. The Commission could not have discovered that wrongdoing earlier because Defendants took affirmative acts to conceal it, and because of the self-concealing nature of Defendants' wrongdoing.

47.    For example, Alpert's September 2003 memorandum to the mutual fund directors was designed to conceal Headstart's market timing and Defendants' wrongdoing from the Board and investors and to reassure them that market timing was not a problem at Gabelli Funds. Further, Alpert, in Marc Gabelli's presence, told the GGGF Board that Gabelli Funds was taking measures to eliminate market timers, but Alpert omitted any disclosure of the fact that he and Marc Gabelli were allowing Headstart to continue market timing to the detriment of long-term investors. Lastly, Alpert specifically directed Gabelli Funds' "market-timing" police not to monitor Headstart's trading, effectively hiding the Defendants' wrongdoing.

## FIRST CLAIM
### Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder
### (Against Bruce Alpert)

48.    Paragraphs 1 through 47 are realleged and incorporated by reference as if set forth fully herein.

49.    Defendant Alpert, by engaging in the conduct described above knowingly or recklessly, by the use of the means or instrumentalities of interstate commerce or of the mails, in connection with the purchase or sale of securities, directly or indirectly:

(a) employed devices, schemes or artifices to defraud;

(b) made untrue statements of material fact or omitted to state material facts necessary to make the statements made, in the light of the circumstances under which they were made, not misleading; or

(c) engaged in acts, practices or courses of business which operated or would have operated as a fraud or deceit upon any person.

50.    By reason of the foregoing, defendant Alpert, directly or indirectly, violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder.

**SECOND CLAIM**
**Violations of Section 17(a) of the Securities Act**
**(Against Bruce Alpert)**

51.    Paragraphs 1 through 47 are realleged and incorporated by reference as if set forth fully herein.

52.    Defendant Alpert, by engaging in the conduct described above, knowingly, recklessly, or negligently in the offer or sale of securities, by the use of the means or instrumentalities of transportation or communication in interstate commerce or by use of the mails, directly or indirectly:

(a) employed devices, schemes, or artifices to defraud;

(b) obtained money or property by means of untrue statements of material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or

(c) engaged in transactions, acts, practices or courses of business which operated or would have operated as a fraud or deceit upon the purchaser.

53.     By reason of the foregoing, Alpert directly or indirectly violated and unless restrained and enjoined will continue to violate Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

### THIRD CLAIM
### Aiding and Abetting Violations of Sections 206(1) and 206(2) of the Investment Advisers Act
### (Against Marc Gabelli and Bruce Alpert)

54.     Paragraphs 1 through 47 are realleged and incorporated by reference as if set forth fully herein.

55.     Gabelli Funds knowingly or recklessly, by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly (a) employed devices, schemes, or artifices to defraud clients or prospective clients; and (b) engaged in transactions, practices, or courses of business which operated as a fraud or deceit upon clients or prospective clients, thereby violating Sections 206(1) and 206(2) of the Investment Advisers Act [15 U.S.C. §§ 80b-6(1) and (2)].

56.     Defendants Marc Gabelli and Bruce Alpert, and each of them, by engaging in the conduct described above, knowingly provided substantial assistance to Gabelli Funds' violations of Sections 206(1) and 206(2) of the Advisers Act.

57.     By reason of the foregoing, defendants Marc Gabelli and Alpert aided and abetted, and unless restricted and enjoined, will continue to aid and abet violations of Sections 206(1) and 206(2) of the Investment Advisers Act [15 U.S.C. §§ 80b-6(1) and (2)].

### JURY DEMAND

58.     The Commission hereby demands trial by jury on all claims so triable.

## PRAYER FOR RELIEF

59.    WHEREFORE, Plaintiff Securities and Exchange Commission respectfully requests that this Court enter a final judgment:

A.    Enjoining Defendant Bruce Alpert and his respective agents, servants, employees, attorneys, assigns and all those persons in active concert or participation with him who receive actual notice of the injunction by personal service or otherwise, from directly or indirectly engaging in or aiding and abetting violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)]; and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

B.    Enjoining Defendants Marc Gabelli and Bruce Alpert and their respective agents, servants, employees, attorneys, assigns and all those persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, from directly or indirectly aiding and abetting violations of Sections 206(1) and 206(2) of the Investment Advisers Act [15 U.S.C. §§ 80b-6(1) and (2)];

C.    Ordering Defendants Marc Gabelli and Bruce Alpert to disgorge all ill-gotten gains from their illegal conduct together with prejudgment interest thereon;

D.    Ordering Defendants Marc Gabelli and Bruce Alpert to pay civil monetary penalties pursuant to Section 209(e) of the Investment Advisers Act [15 U.S.C. § 80b-9(e)]; and, as to Defendant Alpert, Section 20(d) of the Securities Act [5 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. §78u(d)(3)]; and

      E.      Granting such other and further relief as this Court deems

necessary and appropriate under the circumstances.

                                                      Respectfully submitted,

Robert B. Blackburn

Kevin P. O'Rourke
(Local Counsel)                                   Christopher R. Conte
Securities and Exchange Commission                Mark Kreitman
3 World Financial Center, Room 4300               Ivonia K. Slade
New York, New York  10281-1022                    Jill S. Henderson
(212) 336-1050                                    Securities and Exchange Commission
BlackburnR@sec.gov                                100 F Street, N.E.
                                                  Washington, D.C. 20549-4010
                                                  (202) 551-4442 [ORourke]
                                                  (202) 772-9246 [Fax]
                                                  ORourkeK@sec.gov

                                                  Attorneys for Plaintiff

Dated: April ___, 2008