UNITED STATES COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------- X

SECURITIES AND EXCHANGE COMMISION,
                     Plaintiff,

                     v.

MARC J. GABELLI, and BRUCE ALPERT,

                  Defendants.

-------------------------------------------------------------------- X

        :    ECF CASE

        :    Case No. 08-Civ-3868
        :    (DAB)

## MEMORANDUM OF LAW IN SUPPORT OF MARC GABELLI'S MOTION TO DISMISS

Lewis J. Liman
Jason P. Gottlieb
CLEARY GOTTLIEB STEEN &
HAMILTON LLP
One Liberty Plaza
New York, NY 10006
*Attorney for Marc J. Gabelli*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................................ ii

PRELIMINARY STATEMENT ...................................................................................... 1

FACTUAL BACKGROUND ........................................................................................... 2

ARGUMENT ................................................................................................................... 6

I. THE COMPLAINT FAILS TO STATE A CLAIM AGAINST MR. GABELLI..... 6

II. THE SECTION 206(1) CLAIM SHOULD BE DISMISSED FOR FAILURE
  TO STATE A CLAIM AND TO PLEAD FRAUD WITH PARTICULARITY ...... 11

III. THE SEC'S REQUEST FOR RELIEF SHOULD BE DISMISSED
  WITH PREJUDICE ................................................................................................. 14

IV. ANY PUNITIVE RELIEF THE SEC SEEKS IS TIME-BARRED BY
  THE FIVE-YEAR STATUTE OF LIMITATIONS
  ESTABLISHED IN 28 U.S.C. § 2462 ...................................................................... 17

CONCLUSION ................................................................................................................ 25

i

## TABLE OF AUTHORITIES

**Page(s)**

**RULES AND STATUTES**

| | |
|---|---|
| 17 C.F.R. § 275.204-2(a)(3) | 22 |
| 15 U.S.C. § 78t(e) | 145 |
| 15 U.S.C. § 80b-3(i) | 16, 17 |
| 15 U.S.C. § 80b-4(a) | 22 |
| 15 U.S.C. § 80b-6(1) | 6 |
| 15 U.S.C. § 80b-6(2) | 6 |
| 15 U.S.C. § 80b-9(e) | 17 |
| 15 U.S.C. § 80b-9(e)(1) | 15 |
| 15 U.S.C. § 89(d) | 16 |
| 28 U.S.C. § 2462 | 17 |

**CASES**

| | |
|---|---|
| 3M Co. v. Browner,<br>17 F.3d 1453 (D.C. Cir. 1994) | 17, 22 |
| Abercrombie v. Andrew College,<br>438 F. Supp. 2d 243 (S.D.N.Y. 2006), | 19 |
| Armstrong v. McAlpin,<br>699 F.2d 79 (2d Cir. 1983) | 9, 12 |
| ATSI Commc'n, Inc. v. The SHAAR Fund, Ltd.,<br>493 F.3d 87 (2d Cir. 2007) | 12 |
| Austin v. Bradley, Barry & Tarlow, P.C.,<br>836 F. Supp. 36 (D. Mass. 1993) | 9 |
| Bell Atl. Corp. v. Twombly,<br>550 U.S. ___, 127 S. Ct. 1955 (2007) | 2, 23 |
| Bilick v. Eagle Electric Mfg. Co.,<br>807 F. Supp. 243 (E.D.N.Y. 1992) | 19 |
| Bingham v. Zolt,<br>683 F. Supp. 965 (S.D.N.Y. 1988) | 20 |

Bloor v. Carro, Spanbock, Londin, Rodman & Fass,
754 F.2d 57 (2d Cir. 1985)........................................................................................... 6, 9

Brass v. Am. Film Tech., Inc.,
987 F.2d 142 (2d Cir. 1993)......................................................................................... 21

Butala v. Agashiwala,
916 F. Supp. 314 (S.D.N.Y. 1996) .............................................................................. 19, 20

Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.,
511 U.S. 164 (1994)..................................................................................................... 16

Century Pac., Inc. v. Hilton Hotels Corp.,
528 F. Supp. 2d 206 (S.D.N.Y. 2007)......................................................................... 20

Chambers v. Time Warner, Inc.,
282 F.3d 147 (2d Cir. 2002)......................................................................................... 2

Chiarella v. U.S.,
445 U.S. 222 (1980)..................................................................................................... 10

Chill v. General Electric Co.,
101 F.3d 263 (2d Cir. 1996)......................................................................................... 14

Corcoran v. New York Power Auth.,
202 F.3d 530 (2d Cir. 1999)......................................................................................... 19

Cortec Indus., Inc. v. Sum Holding L.P.,
949 F.2d 42 (2d Cir. 1991)........................................................................................... 3

D'Antonio v. Metro. Transp. Auth.,
No. 06 CV 4283(KMW), 2008 WL 582354 (S.D.N.Y. Mar. 4, 2008)...................... 18

Dep't of Revenue of Or. v. ACF Indus., Inc.,
510 U.S. 332 (1994)..................................................................................................... 16

Domenikos v. Roth,
No. 07-0406-cv, 2008 WL 2329315 (2d Cir. June 5, 2008)....................................... 18

First Lincoln Holdings, Inc. v. Equitable Life Assur. Soc'y of U.S.,
164 F. Supp. 2d 383 (S.D.N.Y. 2001),
aff'd, 43 Fed. Appx. 462 (2d Cir. 2002) ..................................................................... 1

Field v. Trump,
850 F.2d 938(2d Cir. 1988)......................................................................................... 7-8

Ghartey v. St. John's Queens Hosp.
869 F.2d 160 (2d Cir. 1989)......................................................................................... 18

iii

Howard v. SEC,
376 F.3d 1136 (D.C. Cir. 2004) .................................................................................... 12

IIT, An International Investment Trust v. Cornfeld,
619 F.2d 909 (2d Cir. 1980).......................................................................................... 9

In re Crude Oil Commodity Litig.,
No. 06 Civ. 6677 (NRB), 2007 WL 1946553 (S.D.N.Y. June 28, 2007)............................. 12

In re Flanagan,
Rel. No. ID-160, 2000 WL 98210 (SEC Jan. 31, 2000) ......................................................... 1

In re Mut. Funds Inv. Litig.,
384 F. Supp. 2d 845 (D. Md. 2005) .................................................................................... 1

In re NYSE Specialists Sec. Litig,
503 F.3d 89 (2d Cir. 2007),
cert. denied, 128 S. Ct. 1707 (2008) ......................................................................... 2

In re Rhodia S.A. Sec. Litig.,
531 F. Supp. 2d 527 (S.D.N.Y. 2007) (Batts, J.) .................................................... 3

Johnson v. SEC,
87 F.3d 484 (D.C. Cir. 1996) ..................................................................................... 23

Jones v. Bock,
127 S. Ct. 910 (2007).................................................................................................. 18

Lerner v. Fleet Bank, N.A.,
459 F.3d 273 (2d Cir. 2006)........................................................................................ 12

Moviecolor Ltd. v. Eastman Kodak Co.,
288 F.2d 80 (2d Cir. 1961)........................................................................................... 19

Muller-Paisner v. TIAA,
446 F. Supp. 2d 221 (S.D.N.Y. 2006) (Batts, J.) ...................................................... 8

New York v. Niagara Mohawk Power Corp.,
263 F. Supp. 2d 650 (W.D.N.Y. 2003) ...................................................................... 18

O'Brien v. Nat'l Prop. Analyst Partners,
719 F. Supp. 222 (S.D.N.Y. 1989) ............................................................................. 20

Reves v. Ernst & Young,
507 U.S. 170 (1993)..................................................................................................... 15

Rich v. Maidstone Financial, Inc.,
No. 98 Civ. 2569, 2002 WL 31867724 (S.D.N.Y. Dec. 20, 2002) (Batts, J.) ...................... 10

iv

Ross v. Bolton,
904 F.2d 819 (2d Cir. 1990)..................................................................................... 12

Russello v. U.S.,
464 U.S. 16 (2000)..................................................................................................... 16

San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Co.,
75 F.3d 801 (2d Cir. 1996)......................................................................................... 10

Santos v. Dist. Council of NYC,
619 F.2d 963 (2d Cir. 1980)....................................................................................... 18

SEC v. AbsoluteFuture.com,
393 F.3d 94, 96 (2d Cir. 2004)................................................................................... 14

SEC v. Berry,
No. C-07-04431 RMW, 2008 WL 2002537 (N.D. Cal. May 7, 2008)................... 19

SEC v. Bolla,
No. 02-1506 (CKK), 2008 WL 1959502 (D.D.C. May 6, 2008)............................ 17

SEC v. Johnson,
530 F. Supp. 2d 325 (D.D.C. 2008) ......................................................................... 16

SEC v. Jones,
476 F. Supp. 2d 374 (S.D.N.Y. 2007) ("Jones II")................................................. passim

SEC v. Jones,
No. 05 Civ. 7044 (RCC), 2006 WL 1084276 (S.D.N.Y. Apr. 25, 2006) ("Jones I")............ 6, 11, 23

SEC v. Monarch Fund,
608 F.2d 938 (2d Cir. 1979)....................................................................................... 15

SEC v. Moran,
922 F. Supp. 867 (S.D.N.Y. 1996) ........................................................................... 12, 13

SEC v. PIMCO Advisors Fund Mgmt. LLC,
341 F. Supp. 2d 454 (S.D.N.Y. 2004)....................................................................... passim

SEC v. Power,
525 F. Supp. 2d 415 (S.D.N.Y. 2007)....................................................................... 24

SEC v. Scrushy,
No. CV-03-J-6155, 2005 WL 3279894 (N.D. Ala. Nov. 29, 2005) ...................... 17-18

SEC v. Steadman,
967 F.2d 636 (D.C. Cir. 1992).................................................................................... 12, 13

SEC v. Tambone,
417 F. Supp. 2d 127 (D. Mass. 2006) ....................................................................... passim

SEC v. Treadway,
430 F. Supp. 2d 293 (S.D.N.Y. 2006)....................................................................... 9

SEC v. Treadway,
No. 04 Civ. 3464 (VM), 2006 WL 1293499 (S.D.N.Y. May 9, 2006).................................. 4

Strauss v. Credit Lyonnais,
No. CV-06-0702 (CPS), 2007 WL 2296832 (E.D.N.Y. Aug. 6, 2007)................................. 21

Tellabs v. Makor Issues & Rights, Ltd.,
___ U.S. ___, 127 S. Ct. 2499 (2007)....................................................................... 2, 12

Toto v. McMahan, Brafman, Morgan & Co.,
No. 93 Civ. 5894(JFK), 1995 WL 46691 (S.D.N.Y. Feb. 7, 1995)....................................... 21

Transamerica Mortgage Advisers, Inc. v. Lewis,
444 U.S. 11 (1979)........................................................................................... 16

World Wrestling Entm't., Inc. v. Jakks Pac., Inc.,
530 F. Supp. 2d 486 (S.D.N.Y. 2007)....................................................................... 19

**OTHER AUTHORITIES**

Alliance Capital Mgmt., L.P., No. 3-11359, Release No. IA-2205 (SEC Dec. 18, 2003),
available at http://www.sec.gov/litigation/admin/ia-2205.htm................................................ 4

Disclosure Regarding Market Timing and Selective Disclosure of Portfolio Holdings,
SEC Release No. 33-8408 (Apr. 16, 2004)............................................................... 8

Fred Alger Mgmt., Inc., No. 3-12540, Release No. 34-55118 (SEC Jan. 18, 2007),
available at http://www.sec.gov/ litigation/admin/2007/34-55118.pdf ................................. 4

Fremont Inv. Advisors, Inc., No. 3-11726, Release No. IA-2317 (SEC Nov. 4, 2004),
available at http://www.sec.gov/litigation/admin/ia-2317.htm................................................ 4-5

Invesco Funds Group, Inc., No. 3-11701, Release No. 34-5056 (SEC Oct. 8, 2004),
available at http://www.sec.gov/litigation/admin/34-50506.htm........................................... 4

Investment Company Act of 1940,
Pub. L. No. 76-768, tit. I, 54 Stat. 789 (1940) ........................................................ 16

RS Inv. Mgmt., Inc., No. 3-11696, Release No. IA-2310 (SEC Oct. 6, 2004),
available at http://www.sec.gov/litigation/admin/ia-2310.htm............................................. 5

SEC Litig. Release No. 18489 (Dec. 4, 2003),
available at http://www.sec.gov/litigation/ litreleases/lr18489.htm ....................................... 1

SEC Litig. Release No. 19027 (Jan. 10, 2005),
available at http://www.sec.gov/ litigation/litreleases/lr19027.htm ......................................    1

Securities Enforcement Remedies & Penny Stock Reform Act of 1940,
Pub. L. No. 76-768, § 647, 104 Sta. 931 (1990)....................................................................    16

Marc J. Gabelli respectfully submits this memorandum of law in support of his

motion to dismiss the Complaint against him. This action should be dismissed because the

Complaint fails to state any claim, and fails to plead fraud with particularity and because the

relief sought by the Complaint is barred either by statute or by the statute of limitations.

## PRELIMINARY STATEMENT

The SEC seeks in this case to impose penalties and injunctive relief on a mutual

fund portfolio manager for permitting investments that the mutual fund and its adviser allowed.

The SEC alleges that the manager, Marc Gabelli, aided and abetted the adviser's violation of

Section 206 of the Investment Advisers Act because he permitted an investor to "market time" a

mutual fund known as the Gabelli Global Growth Fund ("GGGF"), allegedly in exchange for

that investor's long-term investment of $1 million in a hedge fund that Mr. Gabelli also

managed. The Complaint, however, does not allege that the trading at issue was illegal or

fraudulent. There is no issue of late trading here. And the SEC has repeatedly made clear, in

statements made at the time at issue and even after that time, that the conduct the complaint

addresses – "market timing" – is not illegal.[1]

The Complaint also does not allege that the Fund's prospectus barred market

timing or that the trading was inconsistent with any contemporaneous statements GGGF made to

the investing public. It was not. The prospectus authorized by GGGF's Board (unlike that of

---

[1] See, e.g., SEC Litig. Release No. 18489 (Dec. 4, 2003), available at http://www.sec.gov/litigation/
litreleases/lr18489.htm; SEC Litig. Release No. 19027 (Jan. 10, 2005), available at http://www.sec.gov/
litigation/litreleases/lr19027.htm. During the relevant period, various SEC Administrative Law Judges expressly
stated that "[m]arket timing of mutual fund purchases and sales does not violate federal securities laws." See, e.g.,
In re Flanagan, Rel. No. ID-160, 2000 WL 98210 at *5 (SEC Jan. 31, 2000). Courts agree that market timing is not
illegal per se. See In re Mut. Funds Inv. Litig., 384 F. Supp. 2d 845, 856 (D. Md. 2005); see also, e.g., First Lincoln
Holdings, Inc. v. Equitable Life Assur. Soc'y of U.S., 164 F. Supp. 2d 383, 391 n.9 (S.D.N.Y. 2001) (noting that
market timing "is not illegal. It is purely a matter of contract . . ."), aff'd, 43 Fed. Appx. 462 (2d Cir. 2002); SEC v.
PIMCO Advisors Fund Mgmt. LLC, 341 F. Supp. 2d 454, 468-69 (S.D.N.Y. 2004) ("The Court notes that even the
SEC's new final rule governing market timing and selective disclosure of portfolio holdings would not appear to
prohibit market timing arrangements . . .").

every other fund against which the SEC has brought charges) specifically gave GGGF discretion "to reject any purchase order if, in the opinion of the Fund management, it is in the Fund['s] best interest to do so." Compl. ¶¶ 4, 30. Further, the Complaint does not identify any internal fund rules that the trading violated. Nor does it allege that the trading was at all concealed. In fact, the Complaint alleges that numerous people were aware of it, including the Chief Operating Officer of the Adviser and alleged "head of the market timing police," who permitted it.

Finally, even if the SEC's theories as to Mr. Gabelli had any substantive merit (which they do not), the relief the SEC seeks is barred both by statute and by the applicable statute of limitations. Section 209(e) of the IAA, which the SEC relies upon for relief, permits the Court to impose civil penalties <u>only</u> against the adviser who violated the Advisers Act, and not against an aider and abettor. And disgorgement and injunctive relief are also barred. Moreover, the activity alleged in the Complaint – market timing by a single investor – began in September 1999 and ended by August 7, 2002. Even taking that last date, the limitations period expired long ago, barring the SEC from obtaining any relief that could be characterized as punitive – including, in this case, civil penalties and an injunction.

## FACTUAL BACKGROUND[2]

Prior to 2004, Mr. Gabelli was a portfolio manager of a mutual fund known as the Gabelli Global Growth Fund ("GGGF"). Under Mr. Gabelli's portfolio management, GGGF received numerous accolades, including being ranked number one in its class by Lipper and

---

[2]    For purposes of this motion, Mr. Gabelli accepts the well-pleaded facts in the Complaint as true. <u>See</u> <u>Tellabs v. Makor Issues & Rights, Ltd.</u>, ___ U.S. ___, 127 S. Ct. 2499, 2509 (2007); <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. ___, 127 S. Ct. 1955 (2007). However, it is well established that the Court need not accept legal conclusions, deductions or opinions couched as factual allegations. <u>See</u> <u>In re NYSE Specialists Sec. Litig.</u> 503 F.3d 89, 95 (2d Cir. 2007), <u>cert. denied</u>, 128 S. Ct. 1707 (Mar. 24, 2008). Moreover, on this motion to dismiss the Court may rely upon documents referred to in the Complaint or incorporated therein by reference, or that are integral to the Complaint. <u>See</u> <u>Chambers v. Time Warner, Inc.</u>, 282 F.3d 147, 152-53 (2d Cir. 2002).

2

receiving a five-star ranking from Morningstar.[3]  GGGF was one of four funds in the Gabelli

Global Series Funds, Inc., a series advised by an Investment Adviser named Gabelli Funds, LLC

(the "Adviser").  The Adviser was a subsidiary of GAMCO Investors, Inc. ("GAMCO"), which

employed Mr. Gabelli.[4]  Bruce Alpert was the Adviser's Chief Operating Officer.

The complaint alleges that, from September 1999 to August 2002, Mr. Gabelli

authorized a fund known as Headstart (formerly Folkes Asset Management) to "market time"

GGGF.  Compl. ¶¶ 20-21.  On August 7, 2002, the CEO of Gabelli Funds' parent company gave

instructions to "stop all market timers."  Headstart was stopped immediately thereafter.  Id. ¶ 28.

The complaint does not allege that this trading was contrary to the prospectus of

GGGF or to any rules of the mutual fund or the Adviser.  Indeed, the Complaint affirmatively

alleges that the prospectus "gave the Fund the right to 'reject any purchase order if, in the

opinion of the Fund management, it is in the Fund['s] best interest to do so.'"  Compl. ¶¶ 4, 30.

The Complaint also does not allege that Mr. Gabelli hid the market timing from anyone at the

Advisor.  The Complaint affirmatively alleges that "Bruce Alpert, the Chief Operating Officer of

Gabelli Funds (GGGF's adviser) and alleged head of the market timing police, knew that

Headstart was frequently trading in GGGF and allowed it to continue."  Compl. ¶ 1.[5]  Mr. Alpert

reduced Headstart's trading in April 2002 without Mr. Gabelli's involvement or objection and –

with Mr. Gabelli's support – barred Headstart entirely in August 2002.  Id. ¶¶ 25, 28.  Several

---

[3]     See, e.g., GGGF Annual Reports (Form N-30D) at 1 for 1999 and 2000, attached as Appendices A and B
respectively (All Appendices referenced herein are attached as Exhibits to the accompanying Declaration of
Kimberly C.J. Spiering).  The Court is entitled to take judicial notice of these reports on a motion to dismiss.  See In
re Rhodia S.A. Sec. Litig., 531 F. Supp. 2d 527, 543 (S.D.N.Y. 2007) (Batts, J.) (citing with approval Cortec Indus.,
Inc. v. Sum Holding L.P., 949 F.2d 42, 47 (2d Cir. 1991) ("when a district court decides a motion to dismiss a
complaint alleging securities fraud, it may review and consider public disclosure documents required by law to be
and which actually have been filed with the SEC.").

[4]     Despite his senior position at GAMCO, Mr. Gabelli has never been an officer or director of GAMCO, nor
did he serve on the board of any of the mutual funds he managed.  See GGGF Annual Reports (Form N-30D) for
1999-2002 (attached as Appendices A, B, C, and D respectively), of which the Court may take judicial notice.

[5]     Within months of Folkes' first investment in GGGF, Mr. Nasser and Mr. Alpert "discussed the nature and
frequency of [Folkes] trading" and that "Alpert informed Nasser of the 'ground rules' including that Headstart's
trading would not be acceptable in any fund other than GGGF."  Compl. ¶ 20.

3

other people knew of the activity, including a Gabelli Funds employee who notified Mr. Gabelli of the market timing (id. ¶ 20), two employees who were reviewing purchases in the global funds (id. ¶ 31), the person who notified Mr. Gabelli that Headstart was "entering" GGGF (id. ¶ 42), and the Gabelli officer whom Mr. Alpert allegedly told in July 2001 that Mr. Gabelli was allowing GGGF to be "scalped" (id. ¶ 42).

   The nub of the Complaint appears to be that the Advisor did not disclose the trading and what the SEC characterizes as a quid pro quo agreement to the fund's Board. The SEC alleges that, in February 2001, Alpert reported to the GGGF Board regarding the harm caused by "'market timing' or 'scalping' in global funds . . . and efforts Gabelli Funds was undertaking to combat it," but "did not disclose that Headstart was being permitted to market time GGGF." Compl. ¶ 36. The Complaint also alleges that "Marc Gabelli failed to disclose either Headstart's market-timing activity or the 'sticky asset' arrangement." Id. ¶ 37. Conspicuously, however, the Complaint does not allege Headstart was scalping.

   Moreover, the allegation that Mr. Gabelli made such a "sticky asset" agreement is wholly conclusory. Compl. ¶ 21. There are no allegations that such agreement was made in writing, or even reached orally, or even that both parties intended to reach any particular "agreement."[6] Indeed, the Complaint itself makes clear that if there were any such "agreement,"

---

[6] The SEC alleges that, on April 17, 2000, ten days after Mr. Gabelli allegedly agreed to permit Headstart to increase its timing capacity, Mr. Nasser mentioned a "spirit of cooperation which I think we have and are developing" and then agreed to invest $1 million in a Gabelli-managed hedge fund. Id. ¶ 21-23. The Complaint does not allege what the "spirit of cooperation" related to, and alleges no further facts indicating that any "agreement" was reached. The notion that a quid pro quo agreement would be structured for $1 million is wholly inconsistent with every previous SEC action charging a quid pro quo agreement, each of which involved exponentially larger sums of money. See, e.g., SEC v. Treadway, No. 04 Civ. 3464(VM), 2006 WL 1293499 at *4 (S.D.N.Y. May 9, 2006) ($25 million in "sticky assets"); RS Inv. Mgmt., Inc., No. 3-11696, Release No. IA-2310 (SEC Oct. 6, 2004), available at http://www.sec.gov/litigation/ admin/ia-2310.htm ($130 million); Alliance Capital Mgmt., L.P., No. 3-11359, Release No. IA-2205 (SEC Dec. 18, 2003), available at http://www.sec.gov/litigation/admin/ia-2205.htm ($53 million); Invesco Funds Group, Inc., No. 3-11701, Release No. 34-5056 (SEC Oct. 8, 2004), available at http://www.sec.gov/litigation/admin/34-50506.htm ($26 million); Fred Alger Mgmt., Inc., No. 3-12540, Release No. 34-55118 (SEC Jan. 18, 2007), available at http://www.sec.gov/litigation/admin/2007/34-55118.pdf ($22 million); Fremont Inv. Advisors, Inc., No. 3-11726,

4

its terms did not include a limitation on GGGF's right or ability to impose restrictions on
Headstart's trading: GGGF restricted Headstart's trading on or around April 1, 2002, id. ¶ 25,
and barred it altogether in August 2002, after Gabelli Funds decided to stop all market timers, id.
¶ 28.

   The Complaint's allegations of scienter are similarly conclusory. It alleges that
Mr. Gabelli and Mr. Alpert knew, or were reckless in not knowing, that the trading harmed
mutual fund shareholders. However, there is no allegation that Mr. Alpert, the alleged "head of
the market timing police" – believed that Mr. Nasser's trading was harmful,[7] much less that
Mr. Gabelli knew that Headstart's trading had harmful effects or that it constituted "scalping."[8]
While the Complaint alleges that Gabelli Funds rejected some purchases or banned some traders,
sending them letters that stated market timing could negatively affect the mutual fund investment
process, id. ¶¶ 33-35, the Complaint does not allege that Mr. Gabelli prepared, sent, received, or
even ever saw, any of these letters the Adviser sent, and does not allege that anyone told
Mr. Gabelli that the trading could be harmful. There is no allegation even that Mr. Gabelli was
aware of the frequency of the trades. Out of 863 trades alleged by the SEC, the most the SEC
can say is that Mr. Gabelli was notified that the market timer was coming into the fund on "at
least two occasions." Compl. ¶ 42.

   Finally, the conduct alleged in the Complaint is ancient. It is alleged to have
begun in September 1999 when Mr. Gabelli allegedly authorized Headstart to market time
GGGF. Compl. ¶ 20. The alleged quid pro quo arrangement was struck (if at all) on April 7,

---

Release No. IA-2317 (SEC Nov. 4, 2004), available at http://www.sec.gov/litigation/admin/ia-2317.htm ($10
million, which caused the hedge fund to exceed a $25 million threshold).

[7]  Nor is there an allegation of any motive on the part of Mr. Alpert to permit market timing that he knew to
be harmful.

[8]  The complaint relies instead on the conclusory ipse dixit that Mr. Gabelli "knew or w[as] reckless in not
knowing." Compl. ¶ 42.

2000. Id. ¶ 21. The trades at issue all took place before August 7, 2002. Id. ¶ 28. And the presentation to the Board occurred on February 21, 2001. Id. ¶ 36. The Complaint has no explanation why the SEC, given its broad investigatory powers, could not have discovered this alleged wrongdoing within the limitations period, and makes no allegations whatsoever that the SEC exercised any diligence to do so.

### ARGUMENT

The lone claim against Mr. Gabelli is that he aided and abetted violations of Sections 206(1) and 206(2) of the Investment Advisers Act ("IAA"). This action should be dismissed because the Complaint fails to state that claim, and fails to plead fraud with particularity. Moreover, the portion of the Complaint that seeks punitive relief should be dismissed because (1) civil penalties are not available for aiding and abetting a violation of the IAA and (2) punitive relief is barred by the statute of limitations.

## I.    THE COMPLAINT FAILS TO STATE A CLAIM AGAINST MR. GABELLI

The SEC alleges a single claim against Mr. Gabelli: that he aided and abetted violations of Section 206 of the Advisers Act. To establish that claim, the SEC must allege that (1) the Adviser violated § 206; (2) Mr. Gabelli had knowledge of the Adviser's fraudulent acts; and (3) Mr. Gabelli substantially assisted in the primary violations. See SEC v. Jones, No. 05 Civ. 7044(RCC), 2006 WL 1084276 at *7 (S.D.N.Y. Apr. 25, 2006) ("Jones I"), citing Bloor v. Carro, Spanbock, Londin, Rodman & Fass, 754 F.2d 57, 62 (2d Cir. 1985). Section 206(1), which requires proof of scienter, prohibits the use by an investment adviser of a "device, scheme, or artifice to defraud" a client or prospective client. Section 206(2), which does not require scienter, forbids the adviser from engaging in a "transaction, practice, or course of business which operate[d] as a fraud or deceit upon [a] client or prospective client. 15 U.S.C. §§ 80b-6(1) & 80b-6(2).

6

The SEC does not meet these burdens.  The basic allegations relevant to

Mr. Gabelli are that (1) Gabelli Funds permitted market timing under an arrangement with

Headstart, and (2) Gabelli Funds represented to the Board of GGGF that it was taking steps to

stop harmful market timing (or "scalping") without affirmatively disclosing that arrangement.

Those allegations do not establish a device or scheme to defraud, or a misstatement or actionable

omission to the Board.

First, the SEC cannot sustain a Section 206 claim simply by alleging that the

Adviser knowingly permitted market timing in exchange for a hedge fund investment, even if

that allegation were supported by the facts.  The mere fact of market-timing – without any

allegation of non-disclosure or false statement – does not establish a violation of law.  The SEC

has been clear that market timing itself is not illegal.  See supra at 1 n.1.  And a "market timing

arrangement could not itself be *per se* fraudulent."  PIMCO I, 341 F. Supp. 2d at 463.

Moreover, there is no allegation he had knowledge of improper activity of the primary violator.

As that court stated (on much worse facts than are alleged here):

> The market timing agreement with Canary, standing alone, could not be
> considered *per se* a fraudulent device intended to defraud investors.  The
> SEC does not allege, nor could it, that market timing practices are *per se*
> illegal, since many individual and institutional investors, as part of not
> uncommon investment strategies, continue to attempt to time markets with
> varying degrees of success.  The Court notes that even the SEC's new
> final rule governing market timing and selective disclosure of portfolio
> holdings would not appear to prohibit market timing arrangements of the
> type entered into between the PIMCO Funds and Canary; the rule simply
> requires that a mutual fund's policies, procedures, and practices
> concerning market timing be comprehensively disclosed.  See Final
> Market Timing Rule, 60 Fed. Reg. at 22, 301-03.  Arguably, the terms of
> the alleged Canary agreement, in which Canary received favorable
> treatment in exchange for its placement of long-term investments in
> various PIMCO Funds, violated the PIMCO Entities', and Treadway's and
> Corba's, fiduciary duties towards investors, but such potential violations
> do not by themselves result in violations of Rule 10b-5.  See Field v.
> Trump, 850 F.2d 938, 947-48 (2d Cir. 1988) (allegations that a defendant

7

> violated his fiduciary duties towards investors do not themselves give rise
> to 10b-5 liability). See also Tambone, 417 F. Supp. 2d at 136 ("market
> timing arrangements are not the kind of sham transactions which have
> been held to qualify as schemes to defraud").

PIMCO I, 341 F. Supp. 2d at 468-69.

Nor can the SEC allege a misstatement or actionable omission to the Board of

GGGF regarding the February 21, 2001 presentation to the Board about the Adviser's steps to

stop harmful market timing (or "scalping") without disclosing the alleged Headstart arrangement.

Mr. Gabelli adopts the arguments in Mr. Alpert's brief. See Memorandum of Law in Support of

Defendant Bruce Alpert's Motion to Dismiss the Complaint dated July 25, 2008 ("Alpert Br.")

Section II.; see also Muller-Paisner v. TIAA, 446 F. Supp. 2d 221, 228-29 (S.D.N.Y. 2006)

(Batts, J.) (dismissing fraud claim based, in part, on a finding that none of the allegedly

fraudulent statements were false). [9]   Indeed, Gabelli Funds was taking steps to stop harmful

market timing or scalping. And there was no affirmative obligation to disclose the fact that Mr.

Gabelli and/or Mr. Alpert allegedly exercised their discretion to permit market timing in certain

instances – the prospectus itself already disclosed that they had the right to exercise such

discretion.[10] Compare SEC v. Treadway, 430 F. Supp. 2d 293, 311 (S.D.N.Y. 2006) (prospectus

---

[9]     As that brief notes, the Complaint describes time zone arbitrage and its potential harms, relating to taking advantage of stale pricing in mutual funds. (Compl. ¶ 17). Gabelli Funds refers to time-zone arbitrage as "scalping." Id. ¶ 17. However, the Complaint conspicuously does not allege that Headstart was engaged in time zone arbitrage. Indeed, the Complaint suggests Headstart was engaged in frequent trading, or momentum trading. See Compl. ¶¶ 3, 35, 40.

[10]     Before 2004, there was no requirement for a mutual fund or its adviser to publicly disclose its policy with respect to market timing, or even have a policy. In 2003, the Director of the Division of Investment Management told the United States Senate that "disclosure" of market timing policies "is not mandatory." Testimony of Paul F. Roye, Nov. 2, 2003. It was not until December 2003 (more than one year after Headstart ceased market timing GGGF) that the SEC first suggested that funds be required to disclose market timing policies. The Commission did not make disclosure mandatory until June 2004, well after the relevant period for this case. See Disclosure Regarding Market Timing and Selective Disclosure of Portfolio Holdings, SEC Release No. 33-8408 (Apr. 16, 2004). While Mr. Nasser was trading in GGGF, Form N-1A did not require the disclosure of market timing arrangements. See id. (amending SEC Form N-1A to require disclosure of an investment company's policies and procedures with respect to frequent purchases and redemptions).

8

explicitly stated that market timing "may be deemed by PIMCO Advisors to be detrimental" and limited the number of "round trip" exchanges an investor could make).

Even assuming the Court rejects Mr. Alpert's arguments and holds that the Complaint states a claim that the Adviser violated §§ 206(1) and 206(2), it fails to plead facts sufficient to establish that Mr. Gabelli substantially assisted in that violation. Substantial assistance requires allegations that the defendant's actions were "a proximate cause of the primary violation," Treadway, 430 F. Supp. 2d at 339 (citing Armstrong v. McAlpin, 699 F.2d 79, 92 (2d Cir. 1983)). "Allegations of a 'but for' causal relationship are insufficient." Bloor, 754 F.2d at 63.

Here, the principal allegation against Mr. Gabelli is that he was present when Mr. Alpert, the Chief Operating Officer of Gabelli Funds, gave a presentation to the GGGF Board on market timing without disclosing the Headstart arrangement. Compl. ¶¶ 36-38. But inaction cannot support a claim of substantial assistance, except when "in conscious and reckless violation of a duty to act," see Armstrong, 699 F.2d at 91. In addition, where the SEC alleges an aider and abettor was silent about others' wrongdoing, the SEC must also allege that the "defendant has thrown in his lot with the primary violators" and "benefited from [such] silence." Austin v. Bradley, Barry & Tarlow, P.C., 836 F. Supp. 36, 39-40 (D. Mass. 1993).[11] The SEC cannot meet either requirement.

There is no allegation that Mr. Gabelli himself made a misstatement to the Board (or, for that matter, to investors). There is also no allegation that Mr. Gabelli participated in, or

---

[11]    See also Armstrong v. McAlpin, 699 F.2d 79, 91 (2d Cir. 1983) (allegations of inaction are insufficient to satisfy the substantial assistance prong unless such inaction "was designed intentionally to aid the primary fraud or it was in conscious or reckless violation of a duty to act." (citing IIT, An International Investment Trust v. Cornfeld, 619 F.2d 909, 925-27 (2d Cir. 1980)). A fee received for services alone is too remote and minimal to demonstrate that an alleged wrongdoer's silence was designed intentionally to aid the primary fraud. See Austin, 836 F. Supp. 36, 40.

indeed had anything to do with, the statements made by Mr. Alpert, or that he had any involvement with any writing pertaining to trading in the fund, or that he had any role or responsibility in making such statements. See Rich v. Maidstone Financial, Inc., No. 98 Civ. 2569, 2002 WL 31867724, at *8-9 (S.D.N.Y. Dec. 20, 2002) (Batts, J.) (dismissing securities fraud complaint against defendant who did not make false statement). Absent allegations that Mr. Gabelli was involved with any misstatements, the SEC cannot state a claim that he assisted any scheme.[12]

There is also no allegation that Mr. Gabelli himself had any duty to disclose the market timing. See Chiarella v. U.S., 445 U.S. 222, 235 (1980) ("When an allegation of fraud is based upon nondisclosure, there can be no fraud absent a duty to speak."). SEC v. Tambone, 417 F. Supp. 2d 127 (D. Mass. 2006), is directly on point. There, the SEC charged two senior executives at Columbia Funds Distributor with aiding and abetting violations of Sections 206(1) and 206(2) for knowingly "allowing certain preferred customers to engage in short-term or excessive trading" in Columbia Funds contrary to language in the prospectuses for those funds representing "that such trading was prohibited or [that] indicated a hostility towards such practices." Id. at 130. After finding that the complaint did not allege that either defendant played a role in preparing, drafting, or signing the allegedly misleading statements and were not alleged to have made any oral misrepresentations, id. at 133, the court held that defendants "were under no duty to correct those statements," id. at 135, and that aiding and abetting liability did not lie.

---

[12]    The SEC also alleges that Mr. Gabelli "reported on the operations of GGGF" at the February 21, 2001 meeting and did not "disclose either Headstart's market-timing activity or the 'sticky asset' arrangement. Compl. ¶ 37. However, there is no allegation about what Mr. Gabelli said about the operations of GGGF and therefore no well-pleaded allegation that it was necessary for him to say anything about market timing. See San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Companies, Inc., 75 F.3d 801, 811-12 (2d Cir. 1996) (statements on a given subject may give rise to a duty to disclose information on that subject).

"[I]n the absence of a duty of disclosure, a defendant should be held liable as an aider or abettor only if the plaintiff proves that the defendant had actual knowledge of the improper activity of the primary violator and of his role in that activity." Tambone, 417 F. Supp. at 136. Because the defendants "were not under a duty to disclose the market timing arrangement to investors," the SEC could meet its burden only by alleging "with particularity that the defendants' silence or inaction was consciously intended to further the principal violation," a burden it had not met. Id. at 136-37. In the absence of an affirmative misstatement, allegations that the defendants had entered into and approved the market-timing arrangements and economically benefited from them through the collection of fees was not enough. Id. at 137; compare Jones I, 2006 WL 1084276 (sustaining aiding and abetting claim where SEC alleged defendant authored or reviewed misleading statement before issuance); SEC v. PIMCO Advisors Fund Mgmt. LLC, 341 F. Supp. 2d 454, 463 (S.D.N.Y. 2004) ("PIMCO I") (defendants issued, assisted, and facilitated misleading statements to investors and board regarding market timing).

For the same reasons, Mr. Gabelli cannot be held liable. The Complaint does not allege that Mr. Gabelli made any such allegedly misleading statements, or played any role in preparing, drafting, or signing any allegedly misleading statements. The most that the Complaint says is that Mr. Gabelli was a bystander at a meeting in which Mr. Alpert allegedly omitted material information. As Tambone demonstrates, that is insufficient to sustain a claim.[13]

## II.    THE SECTION 206(1) CLAIM SHOULD BE DISMISSED FOR FAILURE TO STATE A CLAIM AND TO PLEAD FRAUD WITH PARTICULARITY

The Section 206(1) claim against Mr. Gabelli should be dismissed for a second reason: the SEC has failed to plead scienter, a necessary element of that claim, with the requisite

---

[13]    Further, the fact that Mr. Alpert addressed the issue of scalping at the February 21, 2001 Board meeting undercuts any such liability: if Mr. Alpert, the alleged head of the market timing police, did not believe that Headstart was engaged in scalping or otherwise identify Headstart as an issue, the Complaint does not allege any reason that Mr. Gabelli should or would have.

11

particularity required by Rule 9(b).  PIMCO I, 341 F. Supp. 2d at 470; SEC v. Moran, 922 F.

Supp. 867, 897 (S.D.N.Y. 1996).  In the case of Section 206(1), the necessary scienter is that the

defendant "acted with an intent to deceive, manipulate, or defraud."  Moran, 922 F. Supp. at 896

(quoting SEC v. Steadman, 967 F.2d 636, 641 (D.C. Cir. 1992)).  Moreover, to hold a defendant

liable for aiding and abetting a violation of Section 206(1), the plaintiff must also allege that the

defendant had "knowledge of the advisers' fraudulent acts."  PIMCO I, 341 F. Supp. 2d at 470.

In other words, the defendant must have "acted with actual intent," Ross v. Bolton, 904 F.2d 819,

824 (2d Cir. 1990); see also Howard v. SEC, 376 F.3d 1136, 1143 (D.C. Cir. 2004) ("aiding and

abetting liability cannot rest on the proposition that the person should have known he was

assisting violations of the securities laws.") (internal quotations and citations omitted).

These elements cannot be pleaded generally:  the circumstances establishing

fraudulent intent must be pleaded with particularity.  See Tambone, 473 F. Supp. 2d at 167-68

(dismissing §§ 206(1) and (2) charges where the allegations failed to satisfy the particularity

requirement of Rule 9(b)); see generally Tellabs v. Makor Issues & Rights, Ltd., ___ U.S. ___,

127 S. Ct. 2499, 2509 (2007); ATSI Commc'n, Inc. v. The SHAAR Fund, Ltd., 493 F.3d 87, 99

(2d Cir. 2007); In re Crude Oil Commodity Litig., No. 06 Civ. 6677 (NRB), 2007 WL 1946553

at *7 (S.D.N.Y. June 28, 2007) (Tellabs is relevant to how courts interpret Rule 9(b) outside the

PSLRA context).  The SEC faces the same heightened pleading requirements in charging

Mr. Gabelli with aiding and abetting.  See Lerner v. Fleet Bank, N.A., 459 F.3d 273 (2d Cir.

2006) (applying Rule 9(b) and its "strong inference" requirement to claim for aiding and abetting

fraud); Armstrong, 699 F.2d at 92-93 (same).

The SEC alleges that Mr. Gabelli "knew, or w[as] reckless in not knowing, that

GGGF was being harmed" as a result of Headstart's trading.  Compl. ¶ 42.  From that allegation,

12

the SEC would have the Court hold that Mr. Gabelli intended that the GGGF board be defrauded when it was not told of "the detrimental effects of Headstart's market timing on GGGF shareholders." Id. at 38. However, the scienter required to plead an intent to defraud is more than mere recklessness; the SEC must plead "extreme recklessness" or "an extreme departure from standards of ordinary care." Steadman, 967 F.2d at 641-43; Moran, 922 F. Supp. at 897. Even assuming that Mr. Gabelli somehow had a duty to speak or correct a statement of Gabelli Funds' Chief Operating Officer – and there is no allegation that he did – the allegations do not establish, especially with the requisite particularity, that Mr. Gabelli knew that Headstart's trading was harmful or that, in not correcting Mr. Alpert, his conduct was an extreme departure from the standards of ordinary care.

Mr. Alpert was Chief Operating Officer of Gabelli Funds and, according to the SEC, was "head of the market timing police." Compl. ¶ 1. The SEC alleges Mr. Alpert had been intimately involved with the Headstart account – he met with Headstart and explained to them the rules for trading in GGGF. Id. ¶ 20. There was no reason for Mr. Gabelli to think that Mr. Alpert thought that Headstart's trading was harmful, or to come to his own contrary conclusion on that issue, if Mr. Alpert did not say it.[14]

Although the Complaint alleges that there were stop letters sent to some investors, Compl. ¶¶ 34-35, there is no allegation that Mr. Gabelli was aware of those letters or that anyone told him that they believed that the trading was harmful. There is not even any allegation that that Mr. Gabelli was aware of the frequency of the trades: out of 863 trades alleged by the SEC, the most the SEC can say is that Mr. Gabelli was notified that the market timer was coming into

---

[14]     The SEC alleges that in April 2002 Mr. Alpert stated that he had "always been opposed to the market timers in the fund." Compl. ¶ 25 (emphasis removed). But in that same email Mr. Alpert agrees that Headstart can continue to invest in GGGF. The email does not begin to suggest that Mr. Alpert thought Headstart's trading was harmful. Rather, it concerns the fact that market timers can be an annoyance to the Advisor, not investors. See Alpert Br. Section II. (A) (3).

13

the fund on "at least two occasions." Compl. ¶ 42. Compare PIMCO I, 341 F. Supp. 2d at 464-65 (emphasizing allegation that defendant knew market-timing at issue "harmed several of the PIMCO funds" and "was regularly made aware of the harmful nature of Canary's trading activities").[15]

Without a particularized allegation that Mr. Gabelli knew that the market timing he allegedly permitted was against the rules of the fund, or harmful, or contrary to a disclosure to investors, or even that he knew it was occurring frequently, there cannot be any inference – much less a cogent and compelling inference (as required under Tellabs) – that he knew, or was reckless in not knowing, that the Adviser was engaged, intentionally or negligently, in any scheme to defraud. Because there is no allegation that Mr. Gabelli "had actual knowledge of [any] improper activity of the primary violator," the Complaint should be dismissed. Tambone, 417 F. Supp.2d at 136.

## III.    THE SEC'S REQUESTS FOR RELIEF SHOULD BE DISMISSED WITH PREJUDICE

Mr. Gabelli adopts the arguments set forth in Mr. Alpert's brief (Sections I.A. and III.) why disgorgement and injunctive relief are not available as a matter of law. In particular, Gabelli Funds has already paid disgorgement,[16] and the SEC has not alleged any basis for disgorgement separate or apart from that paid by Gabelli Funds. See SEC v. AbsoluteFuture.com, 393 F.3d 94, 96 (2d Cir. 2004) ("double-counting" – claiming disgorgement of funds that have already been disgorged – is "impermissible"). And, with respect to injunctive relief, the Complaint itself states that Mr. Gabelli no longer works for

---

[15]    Simply because (in retrospect) Headstart profited from its trades does not mean Mr. Gabelli knew or should have known that Headstart profited, much less that it was engaged in wrongdoing. *See Chill v. General Electric Co.*, 101 F.3d 263, 269-71 (2d Cir. 1996). It is not illegal for an investor to have a profitable mutual fund trading strategy.

[16]    See Order Instituting Administrative and Cease-And-Desist Proceedings, Making Findings, and Imposing Remedial Sanctions and a Cease-and-Desist Order, Admin. Proc. File No. 3-13019, April 24, 2008, at 10 (attached hereto as Appendix E).

14

Gabelli Funds, Compl. ¶ 10, and does not allege any wrongdoing by Mr. Gabelli after August 2002, or in the future, for which the Second Circuit demands that the SEC "go beyond the mere facts of past violations and demonstrate a realistic likelihood of recurrence." SEC v. Monarch Fund, 608 F.2d 938, 943 (2d Cir. 1979).

       With respect to civil penalties, the Complaint relies on IAA § 209(e) for the Court's authority to order civil penalties. See Compl. ¶ 59D. That section, however, permits the Court to impose civil penalties only against the person who committed a violation of the Advisers Act. It states, in pertinent part, that "the Commission may bring an action in a United States district court to seek, and the court shall have jurisdiction to impose, upon a proper showing, a civil penalty *to be paid by the person who committed such a violation.*" 15 U.S.C. § 80b-9(e)(1) (emphasis added). That language is dispositive. Because it gives the Court authority only against the person who committed a violation, and not a person who aided and abetted the violation, the Court has no authority to impose a civil penalty against an aider and abettor. See, e.g., Reves v. Ernst & Young, 507 U.S. 170, 177 (1993) ("If the statutory language is unambiguous, in the absence of a clearly expressed legislative intent to the contrary, that language must ordinarily be regarded as conclusive.") (internal quotation and citations omitted).

       Indeed, elsewhere, in the federal securities laws, when Congress chose to authorize sanctions against aiders and abettors, it said so explicitly. Thus, Congress explicitly provided that "any person that knowingly provides substantial assistance to another person in violation of a provision of [the Securities Exchange Act of 1934] or of any rule or regulation issued under [the Exchange Act], shall be deemed to be in violation of such provision to the same extent as the person to whom such assistance is provided." 15 U.S.C. § 78t(e). Likewise, when Congress chose to make a civil penalty available against aiders and abettors in an

15

*administrative proceeding*, it also explicitly said so – and imposed standards higher than those to establish a plain violation. Section 401 of the Remedies Act specifically provides that "the Commission may impose a civil penalty if it finds … that such person … has *willfully* aided, abetted, counseled, commanded, induced, or procured such a violation by any other person." 15 U.S.C. § 80b-3(i) (emphasis added); see also SEC v. Johnson, 530 F. Supp. 2d 325, 333 (D.D.C. 2008) (differentiating between a willful and knowing standard for aiding and abetting violations). Finally, in the immediately preceding Section of the Advisers Act, when Congress chose to give the Court power to order injunctive relief against an aider and abettor, it also said so. 15 U.S.C. § 89(d).    That Congress "Congress knew how to impose aiding and abetting liability when it chose to do so," Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A., 511 U.S. 164, 176-77 (1994), and chose not to do so here further confirms that the courts do not have the power to impose penalties on those who aid and abet violations of the IAA.  See Transamerica Mortgage Advisers, Inc. v. Lewis, 444 U.S. 11, 19-20 (1979) (interpreting IAA and stating that "it is an elemental canon of statutory construction that where a statute expressly provides a particular remedy or remedies, a court must be chary of reading others into it."). "Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." Russello v. U.S., 464 U.S. 16, 23 (2000) (internal quotations and citations omitted).[17]

---

[17]      Reading subsection (e)'s civil penalty provision to reach aiding and abetting would render superfluous the *express* inclusion of aiding and abetting within the subsection (d)'s injunctive remedy.   It is an "elementary canon of construction that a statute should be interpreted so as not to render one part inoperative." Dep't of Revenue of Or. v. ACF Indus., Inc., 510 U.S. 332, 340 (1994) (internal quotations and citations omitted).

The IAA's legislative history makes Congress's choice even more clear.  As initially enacted in 1940, the Act authorized the Commission to seek injunctive relief for direct violations but did not contain a civil penalty provision.  See Pub. L. 76-768 (Aug. 22, 1940).  The civil penalty provision was not added until 1990.  See Pub. L. 101-429 (Oct. 15, 1990).  Among other things, the 1990 amendment added civil penalties to both the administrative enforcement regime in § 203 and the judicial enforcement regime in § 209.  On the administrative side, Congress

16

Finally, the only court to have considered the question whether civil penalties are available for aiding and abetting a violation of the Advisers Act has held that they are not. In SEC v. Bolla, No. 02-1506 (CKK), 2008 WL 1959502 at *8 (D.D.C. May 6, 2008), defendant was found liable for aiding and abetting a violation of IAA §§ 206(1) and (2). The Court imposed a civil monetary penalty, and defendant filed a motion to reconsider that penalty. After "searching consideration" of the cases submitted by both defendant and the SEC, the court was unable to find a single case that determined that civil penalties could be imposed against an aider and abettor. Id. The court held "the SEC lacks authority to seek, and the Court lacks jurisdiction to impose, monetary penalties against [a defendant] for his aiding and abetting violations of the Advisers Act." Id. The outcome should not differ here; civil penalties should be barred.

## IV.    ANY PUNITIVE RELIEF THE SEC SEEKS IS TIME-BARRED BY THE FIVE-YEAR STATUTE OF LIMITATIONS ESTABLISHED IN 28 U.S.C. § 2462

The statute of limitations at issue here, 28 U.S.C. § 2462, provides that "an action, suit or proceeding for the enforcement of any civil fine, penalty, or forfeiture, pecuniary or otherwise, shall not be entertained unless commenced within five years from the date when the claim first accrued." A claim first "accrues at the moment a violation occurs." 3M Co. v. Browner, 17 F.3d 1453, 1462 (D.C. Cir. 1994) (citing cases); see also SEC v. Jones, 476 F. Supp. 2d 374, 381-85 (S.D.N.Y. 2007) ("Jones II") (IAA § 206 limitations period started tolling when allegedly fraudulent agreement was consummated); SEC v. Scrushy, No. CV-03-J-6155, 2005 WL 3279894 at *3 (N.D. Ala. Nov. 29, 2005) ("the appropriate start of the statute of limitations is the date of the violations for which the civil penalties are sought, not the discovery

---

added Section 203(i), which authorized the Commission to seek civil penalties "if it finds" that a person "(A) has willfully violated ... [this title] ... [or]; (B) has willfully aided, abetted, counseled, commanded, induced, or procured such a violation by any other person...." 15 U.S.C. § 80b-3(i). That is, Congress expressly distinguished between *actual* violations of the IAA and *aiding and abetting* such violations. On the judicial side, by contrast, Congress added Section 209(e), which authorized the Commission to seek civil penalties in district court only when "any person *has violated* any provision of this [title]...." 15 U.S.C. § 80b-9(e). Thus, Congress clearly appreciated the difference between direct violations of the Act and aiding and abetting.

17

of such violations"); New York v. Niagara Mohawk Power Corp., 263 F. Supp. 2d 650, 660

(W.D.N.Y. 2003) ("under § 2462, the limitations period begins to run on the date that the

violation first occurs").

      This case is outside the limitations period and should be dismissed.[18] The

Complaint alleges that the violation began either in September 1999 (Compl. ¶ 20) (the date

Headstart allegedly began market timing in GGGF), or on April 24, 2000 (Compl. ¶ 23) (the date

that Headstart allegedly increased its market timing activity in exchange for a long-term

investment in a hedge fund), or in February 21, 2001 (when the Board was told of the efforts to

control harmful scalping), and that Headstart's market timing ceased on August 7, 2002. Compl.

¶ 28. Accordingly, the limitations period has expired: in January 2005 if the violation was the

market timing; on August 23, 2005 if the violation was the alleged "quid pro quo"; on June 21,

2006 if the violation was the alleged omission at the Board presentation; or, at the latest, even

assuming that each trade constitutes a separate or continuing violation, on December 6, 2007 –

nearly five months before the April 24, 2008 Complaint was filed.[19]

      The SEC relies entirely on the doctrine of fraudulent concealment to justify its

late filing of the complaint against Mr. Gabelli. That reliance is unavailing. To establish

fraudulent concealment, the SEC must allege that defendant wrongfully concealed material facts

---

[18]     If it appears from the face of a complaint that a cause of action has not been brought within the applicable statute of limitations period, the defense of limitations may be raised in a motion under Fed. R. Civ. P. 12(b)(6). See Domenikos v. Roth, No. 07-0406-cv, 2008 WL 2329315 at *2 (2d Cir. June 5, 2008) (affirming district court's grant of a 12(b)(6) motion to dismiss on, *inter alia*, statute of limitations grounds); Niagara Mohawk, 263 F. Supp. 2d at 655; Ghartey v. St. John's Queens Hosp. 869 F.2d 160, 162 (2d Cir. 1989); Santos v. Dist. Council of NYC, 619 F.2d 963, 967 n.4 (2d Cir. 1980). "[A] complaint is subject to dismissal for failure to state a claim if the allegations, taken as true, show the plaintiff is not entitled to relief. If the allegations, for example, show that relief is barred by the applicable statute of limitations, the complaint is subject to dismissal for failure to state a claim." Jones v. Bock, 127 S.Ct. 910, 920-21 (2007); see also D'Antonio v. Metro. Transp. Auth., No. 06 CV 4283(KMW), 2008 WL 582354 at *10 (S.D.N.Y. Mar. 4, 2008) (granting motion to dismiss plaintiff's fraud claims for failure to plead facts sufficient to establish timely filing).

[19]     The limitations period was extended by four months under tolling agreements between the SEC and Mr. Gabelli. See Tolling Agreement, dated June 28, 2007 and subsequent Amendment to Tolling Agreement, dated September 26, 2007, attached hereto as Appendices F and G.

relating to defendant's wrongdoing, Corcoran v. New York Power Auth., 202 F.3d 530, 543 (2d

Cir. 1999); see also Jones II, 476 F. Supp. 2d at 382; either that Mr. Gabelli "took affirmative

steps to prevent [discovery of the fraud] or that the wrong itself was of such a nature as to be

self-concealing." Jones II, 476 F. Supp. 2d at 382 (citations omitted). These allegations must be

made with the particularity required by Rule 9(b). See Abercrombie v. Andrew College, 438 F.

Supp.2d 243, 266-67 (S.D.N.Y. 2006). The SEC must also allege that the concealment

prevented its discovery of the nature of the claim, and that the SEC exercised due diligence in

pursuing discovery of the claim. Corcoran, 202 F.3d at 543; Jones II, 476 F. Supp. 2d at 382.

The SEC has failed to make any of these allegations, and Mr. Gabelli adopts the

arguments made by Mr. Alpert on these points. See Alpert Br. Section I.C.[20]

Indeed, Mr. Gabelli's arguments are a fortiori. Mr. Gabelli is not alleged himself

to have concealed anything or taken any "affirmative steps" to prevent the SEC from discovering

the alleged fraud. Taking the allegations of the Complaint as true, the trading he permitted was

reviewed and approved by Gabelli Funds' COO (and alleged "head of the market timing

police"), each trade would have been recorded in the fund's books and records, and the trading

stopped when GAMCO's Chairman said it should stop.

---

[20]     On preventing discovery of the claim, see also Butala v. Agashiwala, 916 F. Supp. 314, 320 (S.D.N.Y.
1996) (dismissing complaint where "plaintiffs merely state in a conclusory fashion that the defendants' fraud was
self-concealing, without alleging how any of the aspects of the defendants' misrepresentations obscured their fraud
notwithstanding all the information the plaintiffs concededly possessed.") (internal citations omitted).
         On diligence, see also SEC v. Berry, No. C-07-04431 RMW, 2008 WL 2002537 at **7-8 (N.D. Cal. May
7, 2008) (dismissing without prejudice claims for civil penalties for conduct outside the limitations period for failure
to plead facts alleging SEC acted with due diligence); Bilick v. Eagle Electric Mfg. Co., Inc., 807 F. Supp. 243, 255
(E.D.N.Y. 1992) (a plaintiff claiming fraudulent concealment – even one without the broad investigatory powers of
the SEC – must make "distinct averments as to the time when the [fraud], mistake, concealment, or
misrepresentation was discovered, and what the discovery is, so that the court may clearly see, whether by the
exercise of ordinary diligence, the discovery might not have been before made") (quoting Moviecolor Ltd. v.
Eastman Kodak Co., 288 F.2d 80, 88 (2d Cir. 1961)); World Wrestling Entm't., Inc. v. Jakks Pac., Inc., 530 F. Supp.
2d 486, 530 (S.D.N.Y. 2007) (dismissing claims where complaint failed to allege any facts establishing the
plaintiff's diligence prior to the expiration of the limitations period).

19

Instead, the SEC purports to allege concealment by another defendant. The SEC alleges: (1) Mr. Alpert sent a memorandum in September 2003 to the mutual fund directors that was "designed to conceal Headstart's market timing and Defendants' wrongdoing from the Board and investors and to reassure them that market timing was not a problem at Gabelli Funds" (Compl. ¶ 47); (2) Mr. Alpert "told the GGGF Board that Gabelli Funds was taking measures to eliminate market timers, but Alpert omitted any disclosure of the fact that he and Marc Gabelli were allowing Headstart to continue market timing to the detriment of long-term investors" (id. ¶ 47); and (3) Mr. Alpert "specifically directed Gabelli Funds' 'market timing' police not to monitor Headstart's trading" (id. ¶ 47).

Mr. Gabelli adopts the arguments of Mr. Alpert for why these alleged acts do not constitute fraudulent concealment. See Alpert Br. I.C.1. Even if the Court were not to accept those arguments, however, they would not make out a claim as to Mr. Gabelli. The conduct required to toll the statute of limitations is the personal conduct of the defendant; the SEC cannot overcome the bar by alleging another person engaged in concealment, even if it could allege Mr. Gabelli knew of such concealment. See O'Brien v. Nat'l Prop. Analyst Partners, 719 F. Supp. 222, 232 (S.D.N.Y. 1989) (plaintiff may not "use fraudulent concealment by one defendant as a basis for tolling the statute of limitations against another defendant who did not engage in affirmative fraudulent acts to conceal ... allegations that *other* defendants acted to deceive plaintiffs from filing suit do not plead fraudulent concealment against *all* defendants") (emphasis added); Bingham v. Zolt, 683 F. Supp. 965, 975 (S.D.N.Y. 1988) ("[t]he doctrine of fraudulent concealment tolls the running of the statute of limitations *only* as to the defendants who committed the concealment"); Century Pac., Inc. v. Hilton Hotels Corp., 528 F. Supp. 2d 206, 232 (S.D.N.Y. 2007) (for fraudulent concealment, a plaintiff "must show ... that the

defendant failed to disclose material information that he had a duty to disclose"); Brass v. Am. Film Tech., Inc., 987 F.2d 142, 152 (2d Cir. 1993).[21] Here, the most the SEC can claim is that Mr. Gabelli was present at a February 2001 meeting regarding "scalping" where Mr. Alpert discussed the harm that it caused to the funds and the efforts that Gabelli Funds was undertaking to combat it, but did not discuss that Folkes was engaging in market timing activity in GGGF. Compl. ¶¶ 36, 38. This is insufficient.

Nor does the SEC's bare allegation that the wrongdoing was "self-concealing" suffice. Compl. ¶ 46. "'[F]or a fraud to be self-concealing, the defendant must have engaged in 'some misleading, deceptive or otherwise contrived action or scheme, *in the course of committing the wrong*, that [was] designed to mask the cause of action.'" Jones II, 476 F. Supp. 2d at 382 (emphasis added); see also Toto v. McMahan, Brafman, Morgan & Co., No. 93 Civ. 5894(JFK), 1995 WL 46691 at *10 (S.D.N.Y. Feb. 7, 1995) (to be "self-concealing," there must be a "deception, misrepresentation, trick or contrivance" that is a "necessary step in carrying out the illegal act") (internal citation omitted); see also Strauss v. Credit Lyonnais, No. CV-06-0702(CPS), 2007 WL 2296832 at *8 (E.D.N.Y. Aug. 6, 2007) (dismissing complaint despite allegation that defendant's activities were "inherently self-concealing" because "the Second Circuit requires some affirmative act by defendants to invoke" equitable tolling).

The SEC does not allege, and it could not prove, that any of the elements of the violation here were inherently self-concealing. The violation, as the SEC pleads it, was that GGGF permitted market timing by a trader (Folkes) who made a hedge fund investment and did

---

[21]　　　And, even if it were, there is no allegation that Mr. Gabelli would have known anything was being concealed. The discussion is alleged to have been about harmful market timing. There is no allegation that Mr. Alpert – who allegedly discussed with Mr. Nasser the ground rules of trading in GGGF including "the nature and frequency of Headstart's trading" (Compl. ¶ 20) – believed that Folkes' trading was harmful scalping, much less that Mr. Gabelli (who was not head of the market timing police and did not make the presentation) would have known that Mr. Alpert thought Headstart's trading was harmful scalping, or that his statements regarding efforts to stop certain trading were inconsistent with his discussions with Mr. Nasser.

not disclose that information to the Board. Compl. ¶¶ 20-23. None of those elements required, or involved, deception. Each and every one of Folkes' trades was recorded in GGGF's books and records as they were required to be, and were subject to SEC examination on both a regular and a surprise basis. See 15 U.S.C. § 80b-4(a) (stating that "[a]ll records (as so defined) of such investment advisers are subject at any time and from time to time, to such reasonable periodic, special, or other examinations."); 17 C.F.R. §275.204-2(a)(3) (requiring investment advisers to "make and keep true, accurate and current" memoranda "of each order given by the investment advisor for the purchase or sale of any security…."). Likewise, the hedge fund investment was recorded in GAMCO's records and available. It goes without saying that both the prospectus and the records of any rejected trades (or allowed trades) from other market timers were readily available to the SEC. See 15 U.S.C. § 80b-4(a). And the fact that there was frequent trading in GGGF was obvious – even to those without the SEC's broad investigatory powers – from GGGF's annual reports. [22] See Jones II, 476 F. Supp. 2d at 383 (dismissing on limitations grounds where the SEC "had access to much or all of [the relevant] information through the Funds' prospectuses, registration statements, and the Commission's own investigatory authority"). Indeed, the Complaint itself alleges that, far from being hidden, Headstart's trading was known to at least (1) Gabelli Funds' Chief Operating Officer and head of the market timing police (Compl. ¶ 1); (2) the two members of "the market timing police" (id. ¶ 33); and (3) a "Gabelli officer" (id. ¶ 42); and that the trading was contained in GGGF records that were available to Gabelli Funds' officers (id. ¶ 42).[23]

---

[22]   The GGGF annual report for 2001 disclosed the shares purchased and redeemed in GGGF – that year, a $1.3 billion turnover in a $280 million fund.

[23]   The SEC seems to be claiming that because it did not begin to investigate Gabelli Funds until late 2003 (after New York Attorney General Spitzer began his well-known industry-wide investigation (see PIMCO I, 341 F. Supp. 2d at 461), it could not have begun to investigate Gabelli Funds until then. The D.C. Circuit rejected a similar argument in 3M. See 3M Co., 17 F.3d at 1461.

In <u>Jones</u>, on very similar facts, this Court held that an action for civil penalties and injunctive relief against two individuals for aiding and abetting violations of IAA § 206 was time-barred. <u>Jones II</u>, 476 F. Supp. 2d at 385. There, as here, the defendants, were employees of an adviser to a mutual fund (Citigroup Asset Management ("CAM") adviser to Citigroup-sponsored mutual funds); they recommended that the fund permit a third party to serve as sub-transfer agent for the funds without disclosing that the third party had guaranteed Citigroup revenue that would never be shared with the fund shareholders. <u>Id.</u> at 376-79. The Commission brought suit in 2005, six years after the board presentation, alleging that the corporation, and, as a result, the individual defendants, violated §§ 206(1) and 206(2) by not disclosing to the Fund's board of directors the secret revenue guarantee.

The court held that both the civil penalties and the request for injunctive relief fit within the statutory definition of a "penalty" and were barred by Section 2462. <u>Id.</u> at 382. <u>Jones II</u> further held that the injunctive relief sought was also barred by Section 2462. Based on (1) the fact that more than five years had elapsed between the alleged and the date of suit; (2) "the degree and extent of the consequences to the subject of the sanction" (citing <u>Johnson v. SEC</u>, 87 F.3d 484, 488 (D.C. Cir. 1996)) and (3) the likelihood of recurrence of the violation, the <u>Jones</u> court held that "[t]he practical effect of ... an injunction here would be to stigmatize [Defendant] in the investment community and significantly impair [his] ability to pursue a career," the court barred injunctive relief as outside the statute of limitations. <u>Id.</u> at 385.[24]  (Mr.

---

[24]     In an earlier decision, the <u>Jones</u> court denied defendants' 12(b)(6) motion to dismiss the complaint on limitations grounds, holding that the SEC should be permitted to prove a "self-concealing" act. That decision is distinguishable for at least two reasons. First, the SEC here has not simply pleaded the conclusion of self-concealment, it has also attempted to plead the facts that would support the conclusion. Thus, the Court may consider those factual allegations and dismiss on the basis of them alone. Second, <u>Jones I</u> was rendered prior to the Supreme Court's decision in <u>Twombly</u>. Following <u>Twombly</u>, if the factual allegations pleaded in the Complaint, if proved, would not defeat summary judgment (as the <u>Jones</u> Court ultimately held), the pleading of them cannot defeat a motion to dismiss. <u>Bell Atl. Corp. v. Twombly</u>, 127 S.Ct. 1955, 1965 (2007) (pleadings must contain "enough fact to raise a reasonable expectation that discovery will reveal evidence" of wrongdoing). Were it

23

Gabelli also adopts Mr. Alpert's argument that an injunction is not available where, as here, no
risk of future harm is alleged.  See Alpert Br. Section III.)

   The court rejected the SEC's argument that the limitations period should have
been tolled due to fraudulent concealment: "while Defendants' allegedly fraudulent acts of
misrepresentation may not have been affirmatively disclosed to the Commission, the record does
not support a finding that they were incapable of being known."  Id. at 383.  It added that the
SEC had "fail[ed] to cite a single securities case applying the self-concealing fraud doctrine to
toll a statute of limitations."  Id. at 382.[25]

   Dismissal is similarly appropriate here.  The last affirmative act Mr. Gabelli is
alleged to have committed (agreeing to allow Folkes to invest in GGGF) occurred in April 2000
– over eight years ago.  This case was brought long after the statute of limitations expired.
Mr. Gabelli no longer works for Gabelli Funds or has any responsibility for GGGF (Compl.
¶ 10); he is not alleged ever to have had any involvement with the decision whether to disclose
the alleged market timing arrangement.  The purported wrong at issue here not only was not
understood to be a violation at the relevant time, but now is squarely addressed by federal
regulation that requires its disclosure, but does not ban it.  After waiting for eight years to file
suit alleging a quid pro quo agreement, the SEC clearly does not believe that Mr. Gabelli
presents some imminent risk of public harm.  And its attempted invocation of the Court's

---

otherwise, a plaintiff could always obtain discovery and avoid dismissal on an untimely complaint simply by
pleading the conclusion (but not the facts) that established fraudulent concealment.  Finally, to the extent that Jones I
held that conclusions that would not defeat summary judgment can still defeat a motion to dismiss, that decision was
erroneous.
[25]  In SEC v. Power, 525 F.Supp.2d 415 (S.D.N.Y. 2007), the SEC survived a motion to dismiss by alleging
that the wrong was "self-concealing."  But in that case, the defendant was alleged to have deliberately created an
accounting scheme that was expressly designed to avoid detection.  That scheme satisfies the Jones standard for a
"self-concealing act" sufficient to toll the statute of limitations:  that the defendant take "some misleading, deceptive
or otherwise contrived action or scheme, *in the course of committing the wrong*, that [was] designed to mask the
cause of action.'"  Jones II, 476 F. Supp.2d at 382 (citations omitted).  This case does not.

equitable powers and request for the imposition of an injunction at this late stage can be understood under any set of facts as punitive.

## CONCLUSION

For the foregoing reasons, the complaint should be dismissed or, in the alternative, the Section 206(1) claim should be dismissed, or the claims against Mr. Gabelli for civil penalties and injunctive relief should be dismissed in their entirety with prejudice.

DATED:     July 25, 2008
           New York, NY

CLEARY GOTTLIEB STEEN & HAMILTON LLP

By
    Lewis J. Liman
    Jason P. Gottlieb
    One Liberty Plaza
    New York, New York 10006
    (212) 225-2000

    Attorneys for Marc J. Gabelli