## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION**<br><br>Plaintiff,<br><br>v.<br><br>**MARC J. GABELLI,**<br>**BRUCE ALPERT,**<br><br>Defendants. | :<br>:<br>:<br>:<br>:<br>:<br>:  **Case No. 08 CV 3868 (DAB)**<br>:<br>:<br>:<br>:<br>:<br>:<br>: |

**PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S
OPPOSITION TO DEFENDANTS MARC J. GABELLI'S AND BRUCE ALPERT'S
MOTIONS TO DISMISS**

Kevin P. O'Rourke
Christopher R. Conte
Mark Kreitman
Ivonia K. Slade
Jill S. Henderson
Securities and Exchange Commission
100 F. Street NE
Washington, DC 20001-4628
(202) 551-4484
*Counsel for Plaintiff*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................... iii

I.    Background .............................................................................................................1

II.   Legal Standard ......................................................................................................2

      A.    Rule 12(b)(6)................................................................................................2

      B.    Rule 9(b) ......................................................................................................2

III.  Marc Gabelli and Bruce Alpert Aided and Abetted Gabelli Funds'
      Violation of Sections 206(1) and 206(2) .............................................................2

      A.    Gabelli Funds Violated Sections 206(1) and 206(2)...................................3

      B.    Marc Gabelli Knew of and Substantially Assisted Gabelli
            Funds' Violation ..........................................................................................6

      C.    Bruce Alpert Knew of and Substantially Assisted Gabelli
            Funds' Violation ..........................................................................................8

IV.   Alpert Violated Sections 10(b)(5) and 17(a) ....................................................11

      A.    Alpert Misrepresented and Omitted Material Facts..................................11

      B.    Alpert Actively Participated in a Scheme or Artifice to Defraud..........................13

      C.    Alpert Acted With Scienter.......................................................................13

V.    The Complaint Was Timely Filed.....................................................................14

      A.    The Discovery Rule Applies in SEC Enforcement Actions ....................15

      B.    The Statute of Limitations Was Tolled by Fraudulent Concealment ....................16

      C.    The Statute of Limitations for the Section 10(b) and 17(a) Claims
            Has Not Run..........................................................................................19

      D.    The Statute of Limitations Does Not Apply to Disgorgement or Injunctions .......19

VI.     The Relief Sought is Available .......................................................................................... 21

        A.      The Commission May Seek Disgorgement ........................................................... 21

        B.      Penalties Are Available Under the Advisers Act .................................................. 22

CONCLUSION ......................................................................................................................... 25

## TABLE OF AUTHORITIES

### CASES

*3M Co. v. Browner*, 17 F.3d 1453 (D.C. Cir. 1994) ...........................................................15

*Armstrong v. McAlpin*, 699 F.2d 79 (2d Cir. 1983) ..........................................................10

*Backman v. Polaroid Corp.*, 910 F.2d 10 (1st Cir. 1990) ...................................................5

*Bailey v. Glover*, 88 U.S. 342, 21 Wall. 342 (1874) ........................................................16

*Basic Inc. v. Levinson*, 485 U.S. 224 (1988) ....................................................................12

*Bloor v. Carro, Spanbock, Londin, Rodman & Fass*, 754 F.2d 57 (2d Cir. 1985) ............10

*In re Carter-Wallace, Inc. Securities Litigation*, 220 F.3d 36 (2d Cir. 2000) .....5, 7, 13, 14

*Castellano v. Young & Rubicam, Inc*, 257 F.3d 171 (2d Cir. 2001) ..................................12

*Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S.
164 (1994) ...................................................................................................23, 24, 25

*Chill v. General Electric Co.*, 101 F.3d 263 (2d Cir. 1996) ................................................7

*Exploration Co. v. United States*, 247 U.S. 435 (1918) ....................................................16

*Ganino v. Citizens Utilities Co.*, 228 F.3d 154 (2d Cir. 2000) ......................................5, 13

*Glazer v. Formica Corp.*, 964 F.2d 149 (2d Cir. 1992) ...........................................5, 9, 12

*Goldman v. Belden*, 754 F.2d 1059 (2d Cir. 1985) ...........................................................12

*Holmberg v. Armbrecht*, 327 U.S. 392 (1946) ..................................................................16

*Iqbal v. Hasty*, 490 F.3d 143 (2d Cir. 2007) .......................................................................2

*Long v. Abbott Mortgage Corp.*, 459 F. Supp. 108 (D. Conn. 1978) ..........................17, 18

*Moviecolor Ltd. v. Eastman Kodak Co.*, 288 F.2d 80 (2d Cir. 1961) ...............................15

*In re Natural Gas Commodity Litigation*, 337 F. Supp. 2d 498 (S.D.N.Y. 2004) .............18

*New York v. Hendrickson Brothers, Inc.*, 840 F.2d 1065 (2d Cir. 1988) ...........................17

*RS Investment Management, Inc.,* Investment Advisers Act Release No. 2310, Admin. Proc. File No. 3-11696 (Oct. 6, 2004) ...............................................................4

*Rombach v. Chang*, 355 F.3d 164 (2d Cir. 2004) .............................................................11

*Roth v. Jennings*, 489 F.3d 499 (2d Cir. 2007) ..................................................................2

*SEC v. Alexander*, 248 F.R.D. 108 (E.D.N.Y. 2007)...................................................15, 18

*SEC v. Blavin*, 760 F.2d 706 (6th Cir. 1985) .....................................................................24

*SEC v. Bolla*, 550 F. Supp. 2d 54 (D.D.C. 2008) ..............................................................22

*SEC v. Buntrock*, 2004 U.S. Dist. LEXIS 9495 (N.D. Ill. May 25, 2004)....................15, 16

*SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180 (1963)...............................3, 10

*SEC v. Cavanagh*, 155 F.3d 129 (2d Cir. 1998) ...........................................................20, 21

*SEC v. Cavanagh*, 445 F.3d 105 (2d Cir. 2006) ......................................................19, 20, 21

*SEC v. Colonial Investment Management LLC*, 2008 U.S. Dist. LEXIS 41442 (S.D.N.Y. May 23, 2008).............................................................................................20

*SEC v. Dunn,* No. 07 CV 2058 (S.D.N.Y. filed Sep. 30, 2008) ........................................14

*SEC v. Fehn*, 97 F.3d 1276 (9th Cir. 1996) .......................................................................22

*SEC v. Jones*, 2006 U.S. Dist. LEXIS 22800 (S.D.N.Y. Apr. 25, 2006).....................18, 19

*SEC v. Jones*, 476 F. Supp. 2d 374 (S.D.N.Y. 2007)......................................16, 18, 20, 21

*SEC v. Koenig*, 532 F. Supp. 2d 987 (N.D. Ill. 2007).........................................................15

*SEC v. Lorin*, 869 F. Supp. 1117 (S.D.N.Y. 1994).............................................................20

*SEC v. Lybrand*, 200 F. Supp.2d 384 (S.D.N.Y. 2002) ........................................................6

*SEC v. McCaskey*, 56 F. Supp.2d 323 (S.D.N.Y. 1999) .........................................15, 19, 20

*SEC v. Moran*, 922 F. Supp. 867 (S.D.N.Y. 1996)..........................................................3, 5

*SEC v. North American Research & Development Corp.*, 424 F.2d 63 (2d Cir. 1970) .............................................................................................................................24

*SEC v. PIMCO Advisors Fund*, 341 F. Supp.2d 454 (S.D.N.Y. 2004)....................3, 6, 7, 8

*SEC v. Power*, 525 F. Supp.2d 415 (S.D.N.Y. 2007) ...........................................17, 19, 20

*SEC v. Rana Research, Inc.*, 8 F.3d 1358 (9ᵗʰ Cir. 1993) ....................................24

*SEC v. Schiffer*, 1998 U.S. Dist. LEXIS 6339 (S.D.N.Y. May 1, 1998) ...........................20

*SEC v. Tambone*, 417 F. Supp.2d 127 (D. Mass. 2006) .......................................8

*SEC v. Tandem Management*, 2001 U.S. Dist. LEXIS 19109 (S.D.N.Y. Nov. 13, 2001) ...........................................................................................20

*SEC v. Treadway*, 430 F. Supp.2d 293 (S.D.N.Y. 2006)......................................13

*SEC v. Williams*, 884 F. Supp. 28 (D. Mass. 1995).........................................20

*Stoneridge Investment Partners, LLC v. Scientific-Atlanta, Inc.*, ___ U.S. ___, 128 S. Ct. 761 (2008).........................................................................24, 25

*Tellabs Inc. v. Makor Issues & Rights, Ltd*, ___ U.S. ___, 127 S. Ct. 2499 (2007)..........14

*Turkish v. Kasenetz*, 27 F.3d 23 (2d Cir. 1994) .................................................2

## STATUTES

Fed. R. Civ. P. 9(b) .........................................................................................2

15 U.S.C. §78t(e) ...........................................................................................23

15 U.S.C. § 78u(d)(3) ....................................................................................22, 25

15 U.S.C. § 78u-4(a)(1) .................................................................................2, 14

15 U.S.C. § 80a-12(d)(1)(B)(i) .......................................................................4

15 U.S.C. § 80b-6(1)-(2)................................................................................3

15 U.S.C. § 80b-9(d)......................................................................................22

15 U.S.C. § 80b-9(e)(1) .................................................................................22, 25

15 U.S.C. § 80b-14 ........................................................................................22

28 U.S.C. § 2462............................................................................................14, 15

**MISCELLANEOUS**

141 Cong. Rec. S17,933-04 (daily ed. Dec. 5, 1995) ...................................................23, 24

141 Cong. Rec. S17,965-03 (daily ed. Dec. 5, 1995) .........................................................24

S. Rep. No. 98, 104th Cong. (1995)...................................................................................23

The Securities and Exchange Commission ("the Commission") hereby opposes the motions to dismiss filed by defendants Marc J. Gabelli ("Marc Gabelli") and Bruce Alpert ("Alpert"). Because the Complaint satisfies the pleading requirements of Rule 9(b) and states viable claims against each defendant under Rule 12(b)(6), the motions to dismiss must be denied.

## I.    Background

Marc Gabelli and Alpert argue that the Complaint against them should be dismissed because there is not enough detail in the Complaint and that the conduct is too old. However, in doing so, they oversimplify or overlook the abundant allegations supporting the claims against them. Consistent with the federal rules, efficiency, and plain English, the Commission has concisely set forth its timely allegations in this matter. Those allegations appropriately convey to Marc Gabelli and Alpert the basis of the claims against them, and support all of the causes of action at issue.

The Complaint alleges that Marc Gabelli and Alpert created and maintained an agreement whereby Gabelli Funds LLC ("Gabelli Funds"), adviser to Gabelli Global Growth Fund ("GGGF" or "the Fund"), granted Headstart Advisers Ltd. ("Headstart") market-timing privileges in GGGF in exchange for a long-term investment in a Gabelli Funds-affiliated hedge fund that Marc Gabelli managed and that this agreement resulted in massive harm to GGGF's long-term investors and conflicted with Gabelli Funds' practices and procedures and the assurances Gabelli Funds gave GGGF's Board of Directors. Headstart traded an aggregate of approximately $4.2 billion in GGGF over nearly three years earning internal rates of return of 185 percent, 160 percent and 73 percent, while the rate of return of GGGF's long-term investors, whose returns were diminished by Headstart's trading, was at most negative 24.1 percent. In fact, the market timing the Defendants authorized was so extensive and so flagrant that the sheer volume of Headstart's trading caused GGGF to violate federal securities laws. Nonetheless, the Defendants allowed Headstart to continue

1

harming GGGF in exchange for personal benefit while hiding the scheme from GGGF's Board of Directors and investors.

## II.    Legal Standard

### A.    Rule 12(b)(6)

In assessing the Defendants' motions to dismiss, the Court must read the Complaint generously, accepting as true all facts alleged in the Complaint and drawing all reasonable inferences in favor of the plaintiff. *Roth v. Jennings,* 489 F.3d 499, 501 (2d Cir. 2007). A complaint survives a motion to dismiss so long as the facts as stated in the Complaint allege a plausible claim. *Iqbal v. Hasty*, 490 F.3d 143, 157-58 (2d Cir. 2007), *cert. granted,* 128 S.Ct. 2931 (2008).

### B.    Rule 9(b)

Pursuant to Rule 9(b), "parties must state with particularity the circumstances constituting fraud or mistake," however, "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). The heightened pleading standards of the Private Securities Litigation Reform Act ("PSLRA") do not apply to actions brought by the Commission. 15 U.S.C. § 78u-4(a)(1) ("The provisions of this subsection shall apply in each *private* action arising under this title that is brought as a *plaintiff class action* pursuant to the Federal Rules of Civil Procedure.") (emphasis added). However, in the Second Circuit, the allegations in the Complaint must give rise to a strong inference of scienter. *Turkish v. Kasenetz,* 27 F.3d 23, 28 (2d Cir. 1994).

## III.   Marc Gabelli and Bruce Alpert Aided and Abetted Gabelli Funds' Violation of Sections 206(1) and 206(2)

To state a claim for aiding and abetting Section 206, the Commission must allege (1) that Gabelli Funds violated Section 206; (2) that the Defendants had knowledge of Gabelli Funds' violation of Section 206; and (3) that the Defendants substantially assisted Gabelli Funds' violation.

2

*SEC v. PIMCO Advisors Fund*, 341 F.Supp.2d 454, 471 (S.D.N.Y. 2004). The Commission has more than met this standard.

### A.    Gabelli Funds Violated Sections 206(1) and 206(2)

Sections 206(1) and (2) of the Advisers Act prohibit an investment adviser from employing any device, scheme, or artifice to defraud clients or engaging in any transaction, practice, or course of business that operates as a fraud or deceit on any clients. 15 U.S.C. § 80b-6(1)-(2). Section 206 was enacted to "eliminate, or at least to expose, all conflicts of interest which might incline an investment adviser -- consciously or unconsciously -- to render advice which was not disinterested." *SEC v. Capital Gains Research Bureau, Inc.,* 375 U.S. 180, 191-92 (1963). Thus, Section 206 "establishes a statutory fiduciary duty for investment advisers to act for the benefit of their clients, requiring advisers to exercise the utmost good faith in dealing with clients, to disclose all material facts, and to employ reasonable care to avoid misleading clients." *SEC v. Moran*, 922 F. Supp. 867, 895-96 (S.D.N.Y. 1996). Section 206(1) requires a showing of scienter, while Section 206(2) does not. *Id.* at 896-97.

Gabelli Funds violated its fiduciary duty to GGGF. It allowed Headstart to market time GGGF to the detriment of GGGF and its long-term investors in exchange for a long-term investment in a hedge fund managed by Gabelli Funds' affiliate and it knowingly hid that agreement from GGGF's Board. Compl. at ¶¶20-45. Gabelli Funds' scheme allowed it to profit while GGGF and its long-term investors were significantly harmed. Compl. at ¶¶39-42. This conduct is clearly a violation of Sections 206(1) and 206(2) and Defendants' claims to the contrary are simply unavailing.

First, the Complaint alleges facts that rise well above the standard of plausibility, showing that there was a market-timing agreement. The Complaint alleges that Headstart corresponded with Marc Gabelli, GGGF's portfolio manager, in April 2000 regarding the increase in market-timing

3

capacity and stated that it was "looking forward to doing something on [the hedge fund Marc Gabelli managed] especially in the spirit of cooperation which I think we have and are developing." Compl. at ¶22. It also alleges that the day after the increase in Headstart's timing capacity, Headstart notified Marc Gabelli that Headstart had made the hedge fund investment.[1] Compl. at ¶23. When Headstart's timing capacity was reduced because the size of Headstart's trading was causing GGGF to violate Section 12(d)(1)(B)(i) of the Investment Company Act,[2] Headstart promptly redeemed a portion of its hedge fund investment (Compl. at ¶¶25-26) and Marc Gabelli explained that the redemption occurred because Headstart "was reduced in mkt timing money in mutual funds" (Compl. at ¶26). Later, when Gabelli Funds notified Headstart that it would no longer accept market timing in GGGF, Headstart promptly redeemed its entire remaining investment in Marc Gabelli's hedge fund. Compl. at ¶28.

The Complaint also alleges with particularity that the statements Alpert made to GGGF's Board were fraudulent. First, the Complaint alleges that Alpert told the Board that "Market Timers (scalpers) have been using the International and Global Funds in a way that is disruptive to the Fund and the management of the portfolio. We are making efforts to identify each account and restrict them from purchasing funds." Compl. at ¶¶31, 36. However, both before and after this statement, Gabelli Funds, Marc Gabelli and Alpert were knowingly allowing Headstart to market time GGGF, a global fund, putting their own interests ahead of the Fund's. Compl. at ¶¶20-28. As an investment adviser Gabelli

---

[1] Marc Gabelli argues that Headstart's $1 million investment in his hedge fund was much smaller than the *quid pro quo* investments in other market timing cases. However, a deal of exactly the same size was made in another market-timing case. In *In the Matter of RS Investment Management, Inc., et al.,* RS Investment entered into an agreement whereby a market timer was allowed to make trades of up to $20 million and the market timer simultaneously made a commitment to invest $1 million in one of the RS Investment's funds. *In the Matter of RS Investment Management, Inc. et al.,* Investment Advisers Act Release No. 2310, Admin. Proc. File No. 3-11696 (Oct. 6, 2004). In addition, Headstart's investment in Marc Gabelli's hedge fund occurred when the hedge fund was first forming such that the investment "would have a greater value for [Marc Gabelli] businesswise now, near the beginning." Compl. at ¶22. Finally, whether or not $1 million was an adequate consideration is a question of fact to be decided by the jury.

[2] Section 12(d)(1)(B)(i) of the Investment Company Act makes it unlawful for a registered investment company to sell securities to any investment company, including unregistered investment companies, if after the sale the acquiring company, and companies it controls, would own more than three percent of the acquired fund's securities.

4

Funds was obligated "to disclose all material facts, and to employ reasonable care to avoid misleading clients."[3] *See Moran*, 922 F.Supp. at 896.  In addition, as discussed below, once Gabelli Funds undertook to speak to the Board about market timing, it was required to make that statement complete and accurate. *Glazer v. Formica Corp.,* 964 F.2d 149, 157 (2d Cir. 1992) (quoting *Backman v. Polaroid Corp.,* 910 F.2d 10, 12 (1st Cir. 1990)) (When a corporation makes a disclosure "whether it be voluntary or required--there is a duty to make it complete and accurate.").  Despite these obligations and Gabelli Funds' statements to the Board that market timers were harming the global and international funds and that Gabelli Funds was taking steps to identify and restrict market timers, Gabelli Funds did not disclose that a market timer was being allowed to time GGGF in extremely large amounts, a fact well known to both Marc Gabelli and Alpert.[4]  Compl. at ¶¶31, 36.

Further, the Complaint more than adequately alleges that Gabelli Funds acted with scienter in its violation of Section 206(1).[5]  Scienter can be shown by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness or by alleging facts that show a defendant's conduct was "highly unreasonable and [] represent[ed] an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 168-69 (2d Cir. 2000); *In re Carter-Wallace, Inc. Securities Litig.,* 220 F.3d 36, 39 (2d Cir. 2000).  Here, Gabelli Funds entered into an agreement with Headstart at Marc Gabelli's direction

---

[3]  A fund adviser's client is the fund.

[4]  The Defendants' attempt to distinguish "frequent trading," "time-zone arbitrage," and "scalping" is a red herring.  The crux of the Complaint is that Alpert and Marc Gabelli allowed harmful trading in GGGF in exchange for a long-term investment in a hedge fund Marc Gabelli managed and that they hid this fact from GGGF's Board.  Neither Marc Gabelli nor Alpert dispute that Headstart's trading was harmful.  Labeling it "frequent trading" instead of "market timing" does not change that fact.  Further, the Complaint does allege that Headstart was engaged in market timing.  Compl. at ¶¶20-28.  "Market timing" includes "time-zone arbitrage" and "scalping."  Compl. at ¶17.  In fact, Alpert himself used the terms interchangeably.  *See* Compl. at ¶31.

[5]  The Complaint also alleges violations of Section 206(2) which does not require a showing of scienter.  *Moran*, 922 F. Supp. at 895-96.

5

whereby Headstart was allowed to market time GGGF to the detriment of the Fund and its long-term investors. Compl. at ¶¶20-24. Meanwhile, Gabelli Funds was acknowledging that market timing was harmful and was taking steps to stop other market timers. Compl. at ¶¶30-35. In fact, Alpert told the Board about Gabelli Funds' efforts to stop market timers but did not tell the Board that Headstart was market timing GGGF, a fact of which he was aware. Compl. at ¶¶20, 36-37. The harm GGGF and its long-term investors suffered as a result of the authorized market timing was large and would have been obvious to someone who was monitoring for market timing, as was Gabelli Funds. Compl. at ¶¶24, 31, 39-42. Marc Gabelli, Alpert and Gabelli Funds were aware of the market timing and the agreement with Headstart, knew market timing was harmful, took steps to eliminate other market timers and withheld information about the authorized market timer from the Board. Thus, Gabelli Funds acted with scienter in violating Section 206.

### B.    Marc Gabelli Knew of and Substantially Assisted Gabelli Funds' Violation

Marc Gabelli argues that he did not know about Gabelli Funds' violation and that he did not provide substantial assistance.[6] These arguments are without merit. Marc Gabelli clearly knew, or at a minimum was reckless is not knowing, about Gabelli Funds' violation of Section 206.[7] Marc Gabelli created the market timing agreement with Headstart (Compl. at ¶¶20-27), was affirmatively made aware of Headstart's market timing on more than one occasion (Compl. at ¶¶20-24, 42) and referred to the market timer in writing more than once (Compl. at ¶¶25, 26, 32). Marc Gabelli also knew about the harm caused by market timing because he was present for Alpert's presentation to the

---

[6]  Both Marc Gabelli and Alpert were active participants in Gabelli Funds' violation of Section 206. Their attempts to avoid liability by blaming each other should be disregarded.

[7]  "Recklessness is sufficient scienter to satisfy the knowledge element of aider and abettor liability in this case, where [the defendant], as an executive of the entity that managed investors' funds, owed a fiduciary duty to those who were defrauded by the misleading disclosures." *PIMCO*, 341 F.Supp.2d at 468; *see also SEC v. Lybrand*, 200 F.Supp.2d 384, 400 (S.D.N.Y. 2002) ("In this circuit, it is well-established that recklessness satisfies the scienter requirement for aider and abettor liability when the alleged aider and abettor owes a fiduciary duty to the defrauded party.").

Board (Compl. at ¶¶36-37), he himself rejected at least one market timer (Compl. at ¶32), and he reviewed information on Headstart's trading (Compl. at ¶42). Further, the idea that Marc Gabelli, GGGF's portfolio manager with primary responsibility for the Fund, was not aware of Headstart's trading or the harm to GGGF caused by Headstart's market timing is ludicrous given the sheer magnitude of Headstart's trading. Indeed, Marc Gabelli himself called Headstart's trading "obvious."[8] Marc Gabelli Mot. at 22. Headstart's trading accounted for more than 62 percent of the dollar value of trades in GGGF with an aggregate volume of approximately \$4.2 billion. Compl. at ¶40. On 115 days, Headstart's trades accounted for more than three percent of GGGF's shares, on 83 days it accounted for more than five percent, and on 11 days it exceeded ten percent of GGGF's shares. Compl. at ¶41.

Marc Gabelli also substantially assisted Gabelli Funds' violation of Section 206. He was the architect of the *quid pro quo* agreement (Compl. at ¶¶ 20-27), directly authorized the market timing (Compl. at ¶¶20, 21, 32), sat silently by while Alpert made false and misleading statements to the Board (Compl. at ¶¶36-38), and although he was GGGF's portfolio manager with primary responsibility for the Fund, Marc Gabelli never told GGGF's Board that there was a market timer or that he had made a *quid pro quo* agreement that was detrimental to GGGF and its long-term investors (Compl. at ¶¶10, 37-38).[9] In *PIMCO*, the court held that a portfolio manager provided substantial

---

[8] "An egregious refusal to see the obvious or to investigate the doubtful" can give rise to an inference of recklessness. *In re Carter-Wallace, Inc. Securities Litig.,* 220 F.3d at 39 (quoting *Chill v. General Elec. Co.,* 101 F.3d 263, 269 (2d Cir. 1996)).

[9] Marc Gabelli's attempt to portray himself as an uninvolved bystander is contradicted by the facts. For example, although he claims that he did not object to Alpert placing limitations on Headstart's trading, he did in fact object. After Alpert reduced Headstart's trading in April 1, 2002, Marc Gabelli told Alpert "WHAT IS THE SITUATION WITH MARKET TIMER–I UNDERSTAND YOU TOLD HIM "I SAID" IT WAS OK. . . . VERY PAROCHIAL AND DESTRUCTIVE." Compl. at ¶25.

assistance in a market timing case based on very similar facts.[10]  *PIMCO*, 341 F.Supp.2d at 468.

"[The portfolio manager's] alleged facilitation of the undisclosed [] arrangement and the market

timing activities conducted thereunder, in combination with his failure to correct his own funds'

market timing-related disclosures when they were rendered materially misleading, indicate that [the

portfolio manager]  provided substantial assistance in the primary violation." *Id.*

Marc Gabelli negotiated a self-interested agreement to allow market timing in GGGF (a fund

over which he had primary responsibility), knew the market timing he authorized was harming

GGGF and its long-term investors, and knew that Gabelli Funds was giving the Board false and

misleading information regarding the market timing arrangement he created.  Marc Gabelli clearly

knew about Gabelli Funds' violation and substantially assisted it.

### C.    Bruce Alpert Knew of and Substantially Assisted Gabelli Funds' Violation

Bruce Alpert knew of and substantially assisted Gabelli Funds' violation of Section 206.  His

acts are not ones of inaction and silence as he claims, but those of an active participant.  Specifically,

Alpert (1) gave Headstart the "ground rules" for its market timing in late 1999 or early 2000 (Compl.

at ¶20); (2) directed the market timing police to monitor for market timing and reject market timing

purchases but also instructed the market timing police not to monitor or restrict Headstart's accounts

(Compl. at ¶¶31, 33); (3) wrote a memo in December 2000 which stated that "[m]arket [t]imers

(scalpers) have been using the International and Global Funds in a way that is disruptive to the Fund

and the management of the portfolio" (Compl. at ¶31); (4) was in charge of the market timing police

who sent letters stating that "[m]arket timing can negatively affect the mutual fund investment

process" and therefore "we feel it is in the best overall interest of the Fund's shareholders" to restrict

---

[10]  The defendants in the case relied on by Marc Gabelli, *SEC v. Tambone*, 417 F.Supp.2d 127 (D. Mass. 2006), were not the portfolio managers of the fund being timed.  In fact, they were not even employed by the mutual funds' adviser.  They were executives at the funds' underwriter and distributor.

market timing (Compl. at ¶34); (5) authorized and oversaw the rejection of at least $58 million of purchases and the banning of at least 150 accounts due to market timing (Compl. at ¶35); (6) told GGGF's Board in February 2001 about the harm caused by market timing and the steps Gabelli Funds was taking to combat it but failed to disclose Headstart's ongoing authorized market timing of which he was aware (Compl. at ¶36); (7) continued to allow Headstart to market time GGGF after his presentation to GGGF's Board (Compl. at ¶38); (8) reviewed information on Headstart's trading (Compl. at ¶42); (9) redeemed his personal holdings in GGGF in July 2001 because Marc Gabelli was allowing GGGF to be market timed (Compl. at ¶42); (10) specifically authorized Headstart's market timing so long as Headstart continued its investment in Marc Gabelli's hedge fund (Compl. at ¶25); and (11) told GGGF's Board in a memo dated September 3, 2003, posted on Gabelli Funds' parent company's website, that "for more than two years," market timers had been identified and restricted while in reality Headstart was allowed to market time GGGF until August 2002 (Compl. at ¶¶24-28, 44). These allegations show that Alpert was an active participant in Gabelli Funds' violation of Section 206.

Further, Alpert's argument that the Complaint failed to sufficiently allege that his statements to the Board were misleading is without merit. The Complaint alleges that at the Board meeting he talked about the harm caused by market timing and the steps Gabelli Funds was taking to combat it, but failed to disclose Headstart's massive, authorized, and ongoing market timing, which he had been aware of for some time. Compl. at ¶¶20, 36. Whether market timing was illegal per se or there was a legal requirement to disclose market timing is irrelevant. Alpert chose to speak and thus he had a duty to speak the complete and accurate truth, but he did not. *Glazer,* 964 F.2d at 157.

Similarly, Alpert's argument that the Complaint fails to allege that he knew about the harm to GGGF is completely without basis and ignores a multitude of allegations in the Complaint. The

Complaint alleges that Alpert knew about the harms caused by market timing in global funds such as GGGF (Compl. at ¶¶31, 36), knew Headstart was market timing GGGF (Compl. at ¶¶20, 25, 28), reviewed Headstart's trading data (Compl. at ¶42), was in charge of the market timing police who sent letters stating that market timing was harmful (Compl. at ¶¶30, 31, 34), took steps to limit other market timers including the rejection of millions of dollars of market timing trades by other traders (Compl. at ¶¶31, 34, 35, 38), redeemed his own shares in GGGF because of the market timing in that Fund (Compl. at ¶42), and told Marc Gabelli that he did not like market timers (Compl. at ¶25). The Complaint more than sufficiently alleges that Alpert knew or, at minimum, was extremely reckless in not knowing that Headstart's market timing was harming GGGF.

Finally, Alpert argues that he did not provide substantial assistance because his actions were not the proximate cause of Gabelli Funds' violation. In making this argument Alpert relies on two cases involving private securities litigation. *See Bloor v. Carro, Spanbock, Londin, Rodman & Fass,* 754 F.2d 57, 62-63 (2d Cir. 1985); *Armstrong v. McAlpin,* 699 F.2d 79, 92 (2d Cir. 1983). The reasoning in these cases concerning private damages does not apply to an action brought by the Commission which does not seek damages.[11] *Capital Gains,* 375 U.S. at 195. However, even if proximate causation was required, the Complaint more than adequately pleads that Alpert's substantial assistance proximately caused Gabelli Funds' violation of Section 206. There are numerous allegations related to his active part in the fraudulent scheme. Alpert gave Headstart the "ground rules" (Compl. at ¶20), he directed the market timing police not to monitor Headstart's trading (Compl. at ¶33), he authorized Headstart to continue market timing (Compl. at ¶25), and he covered up the scheme by not telling the Board about Headstart's market timing in 2001 (Compl. at

---

[11]    Marc Gabelli makes the same argument and it fails for the same reason. In addition, as discussed above, even if a showing of proximate cause is required, the Complaint still alleges that Marc Gabelli substantially assisted Gabelli Funds' violation of Section 206.

¶36) and by making misrepresentations about it in his September 2003 memorandum (Compl. at ¶¶44-45).

As outlined in detail above, the Complaint states with particularity facts that show Alpert knew of and substantially assisted Gabelli Funds' violation of Section 206.

## IV.     Alpert Violated Sections 10(b)(5) and 17(a)

In addition to aiding and abetting Gabelli Funds' violation of Section 206, Alpert violated Sections 10(b)(5) and 17(a) when he made misleading and incomplete statements in September 2003 regarding market timing in GGGF. Alpert's arguments that the SEC did not allege the Section 10(b)(5) and 17(a) claims with particularity and that he did not omit a material fact are without merit.

### A.     Alpert Misrepresented and Omitted Material Facts

As alleged with particularity in the Complaint, Alpert misrepresented and omitted material facts in his September 2003 memo. In order to allege a fraud with particularity, a complaint must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004). The Complaint does so. The Complaint alleges that in September 2003 (when), Alpert (the speaker) wrote a memorandum to the Board that was placed on Gabelli's website (where) that made the fraudulent statement that "for more than two years, scalpers have been identified and restricted or banned from making further trades." Compl. at ¶44. This statement was fraudulent because Headstart was allowed to market time or "scalp" GGGF until August 2002.[12] Compl. at ¶¶24-28. A statement that Gabelli Funds' procedures for rejecting and banning scalpers "did not completely eliminate all timers" does not cure this

---

[12]   Alpert also argues that the "SEC itself alleges that the Adviser's failure to exclude Headstart was a function of procedural limitations." Alpert Mot. at 13. This is blatantly false. The Complaint alleges that Headstart was allowed to market time because of the intentional misconduct of Alpert and Marc Gabelli. Compl. at ¶¶20-35.

misstatement—Alpert knew at the time he made his statement that there was an authorized market timer in GGGF during the proceeding two years and therefore knew that the statement "for more than two years, scalpers have been identified and restricted or banned from making further trades" was false. Compl. at ¶¶20-28, 44. In fact, the statement that Gabelli Funds' procedures did not completely eliminate all timers was misleading in that it gave the impression that any failure to exclude market timers was the result of procedural limitations rather than the intentional misconduct of Alpert and Marc Gabelli.

Contrary to Alpert's assertion, the Complaint also alleges with particularity that Alpert failed to disclose facts that he had a duty to disclose. Because Alpert undertook to speak, he was under a duty to make that statement complete and accurate. *Glazer,* 964 F.2d at 157. However, as described above, Alpert's September 2003 statement was neither complete (no mention of Headstart's market timing activities) nor accurate (Headstart was conducting market timing authorized by Gabelli Funds during the two-year period).

In addition, Alpert's misleading statements and omissions were material. Compl. at ¶¶18-19, 43-45. A fact is material if there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Castellano v. Young & Rubicam, Inc,* 257 F.3d 171, 180 (2d Cir. 2001) (quoting *Basic Inc. v. Levinson,* 485 U.S. 224, 231-32 (1988)). A complaint should not be dismissed (or summary judgment granted) based on lack of materiality unless the facts "are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *Goldman v. Belden,* 754 F.2d 1059, 1067 (2d Cir. 1985). Here, Alpert claims that failing to say that there was a market timer timing GGGF is unimportant. However, Alpert's argument is contradicted by the mere fact that he made the September 2003 statement at all. Alpert

12

obviously thought it was important in September 2003 to issue a special statement disclaiming that

same fact following the public announcement of the New York Attorney General's market timing

investigations. Further, the Complaint lists the numerous harms caused by market timing including

an inequitable transfer of wealth, additional transaction costs, higher taxes, and forced trading at

undesirable times. Compl. at ¶¶18-19. Such harms are the type of information that a reasonable

investor would want to know about. *See SEC v. Treadway,* 430 F.Supp.2d 293, 330 (S.D.N.Y. 2006)

("A reasonable investor would want to know of any risks or potential harms associated with his or her

investment," including increased trading and brokerage costs and other harms caused by market

timing.).

### B.   Alpert Actively Participated in a Scheme or Artifice to Defraud

In addition to making false and misleading statements, Alpert actively engaged in a scheme to

defraud. Alpert and Marc Gabelli authorized Headstart to market time GGGF in exchange for an

investment in Marc Gabelli's hedge fund and hid this fact from GGGF's Board. The facts alleged

demonstrate that Alpert was a key player in this scheme. It was he who told the market timing police

not to monitor Headstart's trades (Compl. at ¶33), he provided Headstart with the "ground rules"

(Compl. at ¶20), he failed to inform the Board of Headstart's trading even though he told the Board

that Gabelli Funds was taking steps to restrict market timing (Compl. at ¶36), and he issued a

misleading press release in September 2003 disclaiming market timing (Compl. at ¶¶43-45).

### C.   Alpert Acted With Scienter

The Complaint's allegations of Alpert's conscious misbehavior and recklessness amply

support the finding that Alpert acted with scienter. *See Ganino*, 228 F.3d at 168-69 (Scienter can be

shown by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or

recklessness); *In re Carter-Wallace, Inc. Securities Litig.,* 220 F.3d at 39 (Scienter can be proven

when there are allegations that the defendants' conduct is "highly unreasonable and which represents
an extreme departure from the standards of ordinary care to the extent that the danger was either
known to the defendant or so obvious that the defendant must have been aware of it."). Despite
Defendants' statement to the contrary, the scienter standard applicable to private securities litigation
under *Tellabs Inc. v. Makor Issues & Rights, Ltd,* ___ U.S. ___, 127 S.Ct. 2499, 2510 (2007) does not
apply here. *SEC v. Dunn,* 07 CV 2058, Docket No. 58 at 28-35 (S.D.N.Y. Sep. 30, 2008) (Preska, J.).
*Tellabs* was decided based upon the language of the PSLRA, which does not apply to suits brought in
the public interest by the Commission.[13]   15 U.S.C. § 78u-4(a)(1).  However, even if it did, the
Complaint alleges more than enough facts regarding Alpert's scienter to meet that standard.

In September 2003, Alpert stated that "for more than two years, scalpers have been identified
and restricted or banned from making further trades.  Purchases from accounts with a history of
frequent trades were rejected." However, Alpert was aware that Headstart had been market timing
GGGF until August 2002.[14]  Compl. at ¶¶25, 28.  In fact, during the two years proceeding Alpert's
statement, Alpert himself had authorized Headstart's market timing.  Compl. at ¶25.  Thus, Alpert
was clearly aware of facts that contradicted his September 2003 statements and scienter is shown
when there are allegations that defendants had "knowledge of facts or access to information
contradicting their public statements." *In re Carter Wallace,* 220 F.3d at 40.

## V.    The Complaint Was Timely Filed

Although there is a five-year statute of limitations for Commission actions seeking the
enforcement of fines, penalties or forfeitures, 28 U.S.C. § 2462, there is no statute of limitations for

---

[13]   An extension of *Tellabs* to Commission enforcement actions is unwarranted and would contravene the policy
underlying the different set of pleading requirements, recognized by the Supreme Court itself, that Congress established
for private actions under the PSLRA.

[14]   Alpert's attempt to argue that he "eliminated Headstart from trading in GGGF" and "himself stopped Headstart's
trading" is misleading.  Alpert Mot. at 6, 19.  Alpert took action to completely halt Headstart's trading only after being
directed to do so by the CEO of Gabelli Funds' parent company.  Compl. at ¶28.

14

Commission enforcement actions, such as this one, which seek equitable relief.[15] *SEC v. McCaskey*, 56 F. Supp.2d 323, 326 (S.D.N.Y. 1999). Thus, despite the Defendants' arguments to the contrary, the Commission's requests for equitable relief, including disgorgement and injunctions, are not subject to any statute of limitation. Further, to the extent that the Commission is seeking penalties against Marc Gabelli and Alpert, the statute of limitations has not yet run.

### A.    The Discovery Rule Applies in SEC Enforcement Actions

Defendants argue that the statute of limitations for penalties begins to accrue at the time of violation instead of the time of discovery. In making this argument they rely on *3M Co. v. Browner*, 17 F.3d 1453 (D.C. Cir. 1994) for the proposition that the "discovery rule" does not apply to securities fraud cases. However, the Second Circuit has not ruled on the applicability of the discovery rule to securities fraud cases nor has it adopted the rationale of the D.C. Circuit in *3M*, a non-fraud case. In fact, the Second Circuit has read Supreme Court precedent to hold that "in an action to enforce a federally created right to recover for fraud, a federally established period of limitation does not begin to run until the fraud is discovered." *Moviecolor Ltd. v. Eastman Kodak Co.,* 288 F.2d 80, 83 (2d Cir. 1961).

Several courts have held that the statute of limitations in a securities fraud case begins to accrue at the time the fraud was discovered. *SEC v. Buntrock*, 2004 U.S. Dist. LEXIS 9495 (N.D. Ill. May 25, 2004); *SEC v. Koenig,* 532 F.Supp.2d 987 (N.D. Ill. 2007); *see also SEC v. Alexander*, 248 F.R.D. 108 (E.D.N.Y. 2007) (stating without deciding the issue that "there are significant reasons for finding that a discovery rule governs the accrual of the limitation period contained in Section

---

[15]    Section 2462 provides that "an action, suit or proceeding for the enforcement of any *civil fine, penalty or forfeiture, pecuniary or otherwise,* shall not be entertained unless commenced within five years from the date when the claim first accrued . . . ." 28 U.S.C. § 2462 (emphasis added).

2462").[16]  In *Buntrock*, the Court found that the discovery rule was appropriately applied in a fraud

suit for civil penalties and rejected the D.C. Circuit's reasoning in *3M* because *3M* did not involve

fraud claims. *Buntrock*, 2004 U.S. Dist. LEXIS 9495.  This reasoning is consistent with Supreme

Court precedent which holds that the statute of limitations in fraud actions does not accrue until

discovery of the fraud.  In *Holmberg v. Armbrecht*, 327 U.S. 392 (1946), the Court concluded that the

"discovery rule" governs:

> this Court long ago adopted as its own the old chancery rule that where a plaintiff has
> been injured by fraud and "remains in ignorance of it without any fault or want of
> diligence or care on his part, the bar of the statute does not begin to run until the fraud
> is discovered, though there be no special circumstances or efforts on the part of the
> party committing the fraud to conceal it from the knowledge of the other party."  This
> equitable doctrine is read into every federal statute of limitation.

*Holmberg*, 327 U.S. at 396-97 (quoting *Bailey v. Glover*, 21 Wall. at 348); *see also Exploration Co.*

*v. United States*, 247 U.S. 435 (1918) ("[T]he cause of action did not accrue until the discovery of the

fraud; that such was the undisputed doctrine of the courts of equity, and that the weight of authority,

English and American, applied the same rule to actions at law.").

Under the discovery rule, the statute of limitations in this case would not have begun to accrue

until the misconduct was discovered in the fall of 2003. Compl. at ¶46.  Thus, the statute of

limitations would not have run until the fall of 2008, months after the Complaint in this matter was

filed.

### B.    The Statute of Limitations Was Tolled by Fraudulent Concealment

Even if the statute of limitations for a securities fraud claim begins to accrue at the time of

violation, the statute of limitations in this case was tolled by fraudulent concealment.  A statute of

limitations is tolled when (1) the defendant concealed the cause of action; (2) the cause of action was

---

[16]  *But see, SEC v. Jones*, 476 F.Supp.2d 374, 381 (S.D.N.Y. 2007) (*"Jones II"*) (finding that the discovery rule does not apply in cases governed by Section 2462).

not discovered until some point within the five years before commencement of the action; and (3) the

failure to discover the cause of action at an earlier date was not attributable to the plaintiff's lack of

diligence. *New York v. Hendrickson Bros., Inc.,* 840 F.2d 1065, 1083 (2d Cir. 1988). The first

element, fraudulent concealment, is satisfied if the defendant took affirmative steps to prevent

discovery of the fraud or if the fraud was self-concealing. *Id.* "Affirmative concealment" requires

"some conduct of the defendant directed at the objective of keeping the fraud concealed. By contrast,

a fraud conceals itself when the defendant does only what is necessary to perpetrate the fraud, and

that alone makes the fraud unknowable, without additional efforts at concealment. In other words,

the very essence of the fraudulent practice itself prevents discovery." *Long v. Abbott Mortgage*

*Corp.,* 459 F.Supp. 108, 120 (D. Conn. 1978).

Here the Defendants committed both affirmative acts of concealment and the fraud itself was

self-concealing. The affirmative acts of concealment alleged in the Complaint include Alpert's

instruction to the market-timing police not to monitor or block Headstart's trades (Compl. at ¶33); the

failure to disclose the market timing to the Board (Compl. at ¶38); Alpert's presentation to the Board

in 2001, in Marc Gabelli's presence, wherein he stated that Gabelli Funds was taking steps to

eliminate market timers, but failed to tell the Board that Headstart was being allowed to market time

(Compl. at ¶¶36-37); and Alpert's statements in the September 2003 memorandum which were

designed to assure investors and the Board that Gabelli Funds did not have market-timing problems

(Compl. at ¶¶44-45). Alpert's concealing actions can be attributed to Marc Gabelli for purposes of

the fraudulent concealment doctrine. *See SEC v. Power*, 525 F.Supp.2d 415, 426 (S.D.N.Y. 2007)

(finding that one defendant's concealment was attributable to another defendant for purposes of the

fraudulent concealment doctrine); *Hendrickson Bros.,* 840 F.2d at 1083 ("[T]he jury was entitled to

17

find that the affirmative acts of concealment by [one defendant] were attributable to the other defendants as well.").

The fraud itself was also self-concealing. The essence of this case is that Marc Gabelli and Alpert created and maintained an agreement with Headstart whereby Headstart had market-timing privileges in GGGF in exchange for a long-term investment in a Marc Gabelli-managed hedge fund, that this agreement conflicted with Gabelli Funds' practices and procedures as described to GGGF's Board, and this agreement was hidden from the Board.[17] Concealing Headstart's market timing and the *quid pro quo* agreement from the Board was an essential element of the fraud and thus "the very essence of the fraudulent practice itself prevent[ed] discovery." *See Long,* 459 F.Supp. at 120.

In addition, the failure to discover the cause of action at an earlier date was not caused by a lack of due diligence. As discussed above, the Defendants' fraud was designed to be concealing and they took actions to conceal that fraud. Defendants' heavy reliance on *Jones II* in an attempt to prove otherwise is misplaced. First, that case is factually distinguishable.[18] In *Jones II,* the Court found that the alleged misrepresentations and omissions at issue were discoverable because a memorandum describing the self-dealing transaction had been delivered to the funds' boards and the Commission had access to much or all of this information via the funds' prospectuses, registration statements, and its own investigatory authority. *Id.* at 383. In this case, however, there is no such "smoking gun" memorandum.[19] In addition, under the Defendants' interpretation of *Jones II,* the SEC could never

---

[17] If the fraud is self-concealing there is no need to plead that Marc Gabelli took affirmative steps to conceal the fraud. *SEC v. Jones,* 2006 U.S. Dist. LEXIS 22800 at *17 (S.D.N.Y. Apr. 25, 2006) ("*Jones I*") (quoting *In re Natural Gas Commodity Litig.,* 337 F.Supp.2d 498, 513-14 (S.D.N.Y. 2004)).

[18] A determination of when a statute of limitations has run is very fact dependent. Indeed, while the *Jones II* ruling was decided in favor of the defendants on a motion for summary judgment, the same court ruled at the pleading stage that the allegations in the complaint were sufficient to withstand a motion to dismiss. *Jones I,* 2006 U.S. Dist. LEXIS 22800; *see also Alexander,* 248 F.R.D. at 120 (finding that it was prudent to decide the statute of limitations issue after discovery).

[19] Defendants argue that a detailed analysis of the numbers provided in public filings would have shown that Headstart was market timing. However, Marc Gabelli, who as the portfolio manager of GGGF was clearly far more intimately

18

benefit from the doctrine of fraudulent concealment in cases against investment advisers simply

because the Commission has the ability to inspect investment advisers. However, the *Jones* court

itself and others since then have found that the doctrine can apply to such cases. *See Jones I*, 2006

U.S. Dist. LEXIS 22800; *Power*, 525 F.Supp.2d at 425-26. Finally, neither Defendant argues that the

Board or the SEC had access to information that would have put it on notice of the *quid pro quo*

agreement.

Because the Defendants concealed their fraud, the fraud was not discovered until the fall of

2003, and the failure to discover the fraud at an earlier date was not attributable to the Plaintiff's lack

of diligence, the statute of limitations in this case was tolled by the fraudulent concealment doctrine

and did not begin to run until the fall of 2008.

### C. The Statute of Limitations for the Section 10(b) and 17(a) Claims Has Not Run

Alpert made the fraudulent statement that is the basis of the Section 10(b) and 17(a) claims on

September 3, 2003. Compl. at ¶44. Therefore, under any theory, the statute of limitations on these

claims would not have run until September 2008, months after the Complaint in this was case filed.

### D. The Statute of Limitations Does Not Apply to Disgorgement or Injunctions

Even if the statute of limitations has run, and it has not, it would only affect the Commission's

request for civil penalties, not the injunctive relief and disgorgement the Commission seeks.

*McCaskey*, 56 F. Supp.2d at 326 (Section 2462 does not apply to equitable relief). Despite

Defendants' misguided arguments to the contrary, it is well established in the Second Circuit that

disgorgement is equitable relief. *SEC v. Cavanagh,* 445 F.3d 105, 117 (2d Cir. 2006) ("*Cavanagh

II*"); *Power,* 525 F.Supp.2d at 426 ("Disgorgement is an equitable remedy to which Section 2462

does not apply."). "[B]ecause disgorgement is a remedy aimed at public protection rather than

---

involved in the daily management of GGGF than the Board, and Alpert, the COO and head of the market timing police, argue that they were unable to identify the market timing.

investor compensation, the remedy is decidedly remedial rather than punitive." *Jones II,* 476 F.Supp.2d at 385, *citing Cavanagh II,* 445 F.3d at 117. Thus, the Commission's request for disgorgement is unaffected by any arguments related to a statute of limitations.

Similarly, the Commission's request for injunctions against the Defendants is equitable relief. *See McCaskey,* 56 F. Supp.2d at 325; *SEC v. Williams,* 884 F.Supp. 28, 30 (D. Mass. 1995) ("Although aware of the significant consequences of an S.E.C. injunction, the court concludes that the S.E.C.'s request for injunctive relief is not a penalty for the purposes of § 2462."); *SEC v. Tandem Mgmt.,* 2001 U.S. Dist. LEXIS 19109 at *19 (S.D.N.Y. Nov. 13, 2001) ("Courts have found that SEC suits for . . . permanent injunctions, are not governed by § 2462 because they are not actions or proceedings for a 'penalty' within the meaning of the statute."); *SEC v. Schiffer,* 1998 U.S. Dist. LEXIS 6339 at *8 (S.D.N.Y. 1998) (officer/director bar is equitable relief). "Injunctive relief is expressly authorized by Congress to proscribe future violations of federal securities laws." *SEC v. Cavanagh,* 155 F.3d 129, 135 (2d Cir. 1998) ("*Cavanagh I*"). A remedy that protects the public from future harm is simply not penal, and is not subject to the limitations period that applies to the collection of penalties. *See, e.g., SEC v. Lorin,* 869 F. Supp. 1117, 1125 n.12 (S.D.N.Y. 1994) ("A limitation period of course makes no sense in the context of actions based on existing and prospective violations, because such actions, by definition, seek to remedy conduct that is currently occurring or has yet to occur, respectively.").

Here, injunctions against Marc Gabelli and Alpert are necessary to protect the public from future violations.[20] In determining whether there is a reasonable likelihood of future violations, courts look at (1) the egregiousness of past violations;[21] (2) the degree of scienter involved; (3) whether the infraction is an 'isolated occurrence'; (4) whether the defendant continues to maintain that his conduct was blameless; and (5) whether the defendant might be in a position where future

---

[20]  Defendants' argument about the likelihood of recurrence is a factual matter to be determined after discovery has taken place, not at the motion to dismiss stage.

[21]  In the Second Circuit, there is "significant precedent" for granting injunctive relief based upon allegations of past violations. *Power,* 525 F.Supp.2d at 427; *SEC v. Colonial Investment Mgmt. LLC,* 2008 U.S. Dist. LEXIS 41442 (S.D.N.Y. May 23, 2008).

violations could be anticipated.[22]  *Cavanagh I*, 155 F.3d at 135.  As outlined in the Complaint, there is a reasonable likelihood that Alpert and Marc Gabelli will commit future violations if they are not enjoined.  Alpert is still the Chief Operating Officer of Gabelli Funds, the same position in which he violated the securities laws, clearly giving him the ability to violate securities laws in the future. Compl. at ¶11.  In addition, the conduct alleged in the complaint was not an isolated occurrence, but continued over several years and was a direct violation of fiduciary duties.  Nonetheless, Alpert continues to deny that his conduct was wrong.  Marc Gabelli is currently the Chairman of the Board of a publicly-traded company (Compl. at ¶10), a position where future violations could be anticipated.  Further, he too continues to deny that his multi-year violation of the securities laws and fiduciary duties in exchange for personal benefits was wrong.

## VI.    The Relief Sought is Available

### A.    The Commission May Seek Disgorgement

Defendants' argument that disgorgement is unavailable in this case because Gabelli Funds has already paid the amount of Headstart's profits demonstrates Defendants' confusion about the nature of disgorgement.  As the Second Circuit has stated "[i]n a securities enforcement action . . . 'disgorgement' is not available primarily to compensate victims.  Instead, disgorgement has been used by the SEC and courts to prevent wrongdoers from unjustly enriching themselves through violations" and is thus available "even if it exceeds actual damages to victims."  *Cavanagh II,* 445 F.3d at 117.  Thus, disgorgement by Mark Gabelli and Alpert of any unjust enrichment obtained as a result of their wrongdoing and Gabelli Funds' repayment of the profits made by Headstart, a third party, would not constitute double-counting.  Disgorgement has been properly pled and discovery is necessary to determine the extent of the Defendants' unjust enrichment.

---

[22]  In determining whether an injunction is punitive, the courts may also consider the potential collateral consequences. *Jones II*, 476 F.Supp.2d at 383.  The determination whether such consequences are punitive is made from an objective viewpoint, not the subjective perspective of the accused.  *Id.* at 385.  Here, Defendants argue that the consequences of an injunction would be punitive, but they list no unique potential consequences.  Indeed, the potential consequences that Defendants cite are common to all injunctions sought by the Commission.

**B.    Penalties Are Available Under the Advisers Act**

Based on a recent district court decision in the District of Columbia, *SEC v. Bolla*, 550 F. Supp. 2d 54 (D.D.C. 2008), defendants argue that the Advisers Act does not provide for civil penalties against aiders and abettors.  However, Section 209(e)(1) of the Advisers Act authorizes U.S. district courts to impose civil money penalties against any person who has committed a violation of the Advisers Act.  As used in this statute, the term "violation" includes both direct contraventions of the Advisers Act as well as conduct that aids and abets a direct contravention of the Advisers Act.  Hence, *Bolla* was wrongly decided insofar as the court there failed to find that the term "violation" in Section 209(e)(1) of the Advisers Act covers both primary and secondary liability.[23]

The use of the term "violation" elsewhere in the Advisers Act supports this understanding.  Congress applied the same diction – using only the broad term "violation" – in Advisers Act Section 214 (15 U.S.C. § 80b-14), which gives U.S. district courts jurisdiction "to enjoin any violation of" the Advisers Act.  When read in conjunction with Advisers Act Section 209(d), which authorizes the Commission to bring an injunctive action against anyone who "has engaged ... in any act or practice constituting a violation" of the Advisers Act or who "has aided [and] abetted ... such a violation," it is clear that Congress intended "violation," when used alone, to include both direct contraventions and conduct that aids and abets a direct contravention of the Advisers Act.

Section 21(d)(3) of the Exchange Act, which allows for the imposition of money penalties for "violations" of the Exchange Act, provides an apt comparison.  Courts have consistently held that the language of this provision provides the SEC the ability to seek remedies for aiding and abetting.  *See,*

---

[23]  *Bolla* is the only case we are aware of in which a court has addressed the issue of whether the SEC has the legal authority to obtain civil money penalties against aiders and abettors pursuant to Advisers Act Section 209(e).

*e.g., SEC v. Fehn*, 97 F.3d 1276, 1286 (9th Cir. 1996) (discussing SEC's power to seek remedies for aiding and abetting Exchange Act violations).

In 1994, the Supreme Court decided *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 191 (1994), holding that a private right of action does not exist for aiding and abetting violations of the antifraud provisions of the securities laws. In response, in 1995, Congress promulgated Section 104 of the PSLRA. 15 U.S.C. §78t(e). This section made clear that:

> any person that knowingly provides substantial assistance to another person in violation of a provision of this chapter, or of any rule or regulation issued under this chapter, shall be deemed to be in violation of such provision to the same extent as the person to whom such assistance is provided.

*Id.* However, the legislative history of the provision makes clear that the SEC had authority to bring injunctive actions and obtain civil money penalties against aiders and abettors <u>before</u> *Central Bank of Denver* under the general rubric of a "violation":

> Prior to the Supreme Court's decision in *Central Bank of Denver v. First Interstate Bank of Denver,* courts of appeals had recognized that private parties could bring actions against persons who "aided and abetted" primary violators of the securities laws. In *Central Bank,* the Court held that there was no aiding and abetting liability for private lawsuits involving violations of the securities antifraud provisions.
>
> The Committee considered testimony endorsing the result in *Central Bank* and testimony seeking to overturn this decision. The Committee believes that amending the 1934 Act to provide explicitly for private aiding and abetting liability actions under Section 10(b) would be contrary to S. 240's goal of reducing meritless securities litigation. The Committee does, however, grant the SEC express authority to bring actions seeking injunctive relief or money damages against persons who knowingly aid and abet primary violators of the securities laws.

S. Rep. No. 98, 104th Cong., (1995).

The Conference Report does not discuss the purpose of Section 104, although floor statements by several senators describe the purpose as <u>reinstating</u> the SEC's authority to bring injunctive actions against aiders and abettors.

23

The conference report also reinstates the SEC's authority - which the Supreme Court put into question in the *Central Bank of Denver* case - to bring actions against defendants who knowingly aid and abet securities fraud.

141 Cong. Rec. S17,933-04, * S17,934 (daily ed. Dec. 5, 1995) (statement of Sen. D'Amato).

[Section 104] restores enforcement authority to the Securities and Exchange Commission. That was lost . . . in the 1994 Supreme Court case, the *Central Bank* case. We, in this bill, restore what the *Central Bank* took away from the SEC here. . . . The bill restores the ability of the Securities and Exchange Commission to pursue those who knowingly aid and abet securities fraud.

141 Cong. Rec. S17,933-04, * S17,957 (daily ed. Dec. 5, 1995) (statement of Sen. Dodd).

[Section 104] authorizes the SEC to bring enforcement actions against those who aid and abet a securities fraud, thus reversing the Supreme Court's *Central Bank* decision as it applies to the SEC.

141 Cong. Rec. S17,965-03, * S17,977 (daily ed. Dec. 5, 1995) (statement of Sen. Reid).

The clear lesson of this legislative history is that Congress intended the term "violation" in Exchange Act Section 21(d) to cover both primary liability and secondary liability. Its only intent in promulgating Section 104 was to make the SEC's authority in that regard explicit given the uncertainty following *Central Bank of Denver*. In *Stoneridge Investment Partners, LLC v. Scientific-Atlanta, Inc.*, ___ U.S. ___, 128 S. Ct. 761 (2008), the Supreme Court confirmed this view. The Court justified its prohibition of private plaintiffs from seeking remedies against aiders and abettors in part by citing "Congress' determination that this class of defendants should be pursued by the SEC and not by private litigants." *Id.* at 771. The Court noted that, following its decision in *Central Bank of Denver*, Congress promulgated Section 104 of the PSLRA, thereby "restoring" the ability of the SEC to obtain remedies against aiders and abettors. *Id.* at 772. The Court thus accepted the view that the SEC had the authority to obtain Exchange Act remedies against aiders and abettors before *Central*

24

*Bank of Denver* based on statutory language that refers only generically to "violations" and does not differentiate between primary and secondary violations.[24]

While *Stoneridge*, *Central Bank of Denver*, and Section 104 of the PSLRA deal with the civil injunction and penalty provisions of the Exchange Act, the reasoning applies readily to this case. The wording of Exchange Act Section 21(d)(3)(A) and Advisers Act Section 209(e)(1) are identical in all relevant respects: both give the SEC authority to obtain penalties against a person who "has violated any provision of this title." As the Congressional response to *Central Bank of Denver* shows, and as reflected in *Stoneridge*, this clearly refers both to primary and secondary violations.

**CONCLUSION**

For these reasons, the Court should not grant the Defendants' motions to dismiss.

Respectfully submitted,

Dated:  Oct. 3, 2008

/s/ Jill S. Henderson
Kevin P. O'Rourke
Christopher R. Conte
Mark Kreitman
Ivonia K. Slade
Jill S. Henderson
Securities and Exchange Commission
100 F. Street NE
Washington, DC 20001-4628
(202) 551-4484
(202) 772-9236

---

[24] The importance of the private action element of reliance to the holding of the Court in both *Central Bank*, 511 U.S. at 180, and *Stoneridge*, 128 S. Ct. at 769, confirms that the SEC's previously existing authority to bring an aid and abet claim was not altered by *Central Bank*. It is axiomatic that in Commission enforcement actions, a showing of reliance is unnecessary. *SEC v. Rana Research, Inc., 8 F.3d 1358, 1364* (9th Cir. 1993); *SEC v. Blavin*, 760 F.2d 706, 711 (6th Cir. 1985); *SEC v. North Am. Research & Dev. Corp.*, 424 F. 2d 63, 84 (2d Cir. 1970).