UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------X
SECURITIES AND EXCHANGE COMMISSION

                    Plaintiff,

          -against-

                                          08 Cv. 3868 (DAB)
                                          MEMORANDUM AND ORDER
MARC J. GABELLI, and,
BRUCE ALPERT

                    Defendants.
------------------------------------X
DEBORAH A. BATTS, United States District Judge.

          Plaintiff Securities and Exchange Commission (hereinafter

"SEC") brings suit against Defendant Bruce Alpert for violations

of Section 10(b) of the Exchange Act, Rule 10b-5, and Section

17(a) of the Securities Act.  Plaintiff also brings suit against

Defendants Alpert and Marc J. Gabelli for Aiding and Abetting

Violations of Sections 206(1) and 206(2) of the Investment

Advisers Act.  Each Defendant now moves to dismiss the Complaint

for failure to state a claim under Rule 12(b)(6).  For the

following reasons, Defendants' Motions are GRANTED in part, and

DENIED in part.


                    I. BACKGROUND

          Defendant Marc J. Gabelli ("Gabelli") is a resident of

Connecticut and was portfolio manager for the Gabelli Global

Growth Fund (hereinafter "GGGF") from 1997 until early 2004, as

well as several affiliated hedge funds.  (Compl. ¶ 10.)   The GGGF
was advised by third party Gabelli Funds, LLC ("Gabelli Funds"),
a New York limited liability company and investment adviser
within the meaning of Section 2(a)(20) of the Investment Company
Act and Section 202(a)(11) of the Investment Advisers Act.
(Compl. ¶ 12.)  Defendant Bruce Alpert ("Alpert") is a resident
of New York and has been Chief Operating Officer of Gabelli Funds
since 1988.  (Compl. ¶ 11.)  Third-party Najy N. Nasser, who was
the Chief Investment Adviser for Headstart Advisers, Ltd.
("Headstart"),[1] became acquainted with Mr. Gabelli during the
Summer of 1999.  (Compl. ¶¶ 1, 2, 20.)

        Beginning in September 1999, Gabelli permitted Headstart to
"market-time" the GGGF.  Market-timing is a form of short-term
trading that exploits the fact that mutual funds are generally
priced only once per day, at 4:00 PM, in order to earn a profit
at times when public information is disclosed and has not yet
been incorporated into that price.  (Compl. ¶¶ 15-17.)  One type
of market-timing, known as "time-zone arbitrage" is premised on
the fact that many mutual funds include shares of international
stocks.  Market-timers can take advantage of the fact that price
movements during the "New York trading day" may cause

---

        [1] Headstart has also operated under the name Folkes Asset
Management (Compl. ¶ 1.)

2

corresponding movements in foreign markets once they open, and thus lead to increases in the price of foreign securities that are part of the mutual fund.  However, market-timers know that these increases in foreign security prices will not be incorporated into the mutual fund's price until the following day, enabling them to purchase the fund at an artificially low price and then sell it at a profit the following day when the mutual fund's price is finally adjusted.  (Compl. ¶ 17.)

The Prospectus for GGGF reserved the right to "reject any purchase order if, in the opinion of the Fund management, it is in the Fund['s] best interest to do so" and this language was often used in letters sent to brokers whose customers were suspected of market-timing the fund.  (Compl. ¶¶ 31, 34.)  The letters also explained that "[m]arket timing can negatively affect the mutual fund investment process.  Excessive and unpredictable trading hinders a fund manager's ability to pursue the fund's long-term goals."  (Compl. ¶ 34.)  Gabelli Funds would also occasionally reject individual purchases or ban particular accounts from trading in their funds if those purchases or accounts were suspected of engaging in market-timing. (Compl. ¶ 31.)

Headstart initially conducted its market-timing activities with GGGF utilizing $5,000,000.00 disbursed between two separate

3

accounts.  (Compl. ¶ 20.)  The account information was communicated to a Gabelli Funds employee, who in turn notified Defendant Gabelli.  At some point after Headstart began market-timing, but before April 2000, Alpert communicated to Nasser that Headstart would not be allowed to trade in any fund advised by Gabelli Funds, other than GGGF.  (Compl. ¶ 20.)  On April 7, 2000, Gabelli allowed Headstart to increase the amount that it was market-timing to $20,000,000.00, in consideration of a $1,000,000.00 investment that Headstart promised to make in a hedge fund that Gabelli managed.  (Compl. ¶ 21.)  Headstart notified Gabelli that it had opened up a new account with GGGF to allow for this additional market-timing capacity.  (Compl. ¶ 21.)

On April 17, 2000, Nasser sent an email to Gabelli, pertaining to the increase in market-timing capacity, in which he stated that he was ". . .looking forward to doing something on [Gabelli's] Hedge Fund especially in the spirit of cooperation which I think we have and are developing.  I understand inflows would have a greater value for you businesswise now, near the beginning."  (Compl. ¶ 22.)  On April 18, 2000, Nasser again emailed Gabelli, advising him that he planned on confirming the $1,000,000.00 investment in Gabelli's hedge fund on April 24, 2000.  (Compl. ¶ 23).  Nasser eventually confirmed that this investment had been made on April 25, 2000.  (Compl. 23.)

4

On December 15, 2000, Alpert, in an internal memo, stated that "Market Timers (scalpers) have been using the International and Global Funds in a way that is disruptive to the Fund and the management of the portfolio.  We are making efforts to identify each account and restrict them from purchasing the funds." (Compl. ¶ 31.)  In addition, Alpert had two Gabelli Fund employees, known internally as "market-time police," review certain fund purchases and reject those that appeared to be attempts at market-timing.  (Compl. 31.)  These employees were instructed to ignore the Headstart accounts because they were related to "a Marc Gabelli-client relationship."  (Compl. ¶ 33.) At least one of the employees was given these instructions directly from Alpert.  (Compl. 33.)

Additionally, in December 2000, Gabelli contacted the Chief Financial Officer of the Gabelli Funds to order that a suspected market-timer be banned from trading in GGGF.  (Compl. ¶ 32.)  The communication also expressed that any market-timing activity in GGGF would be "only what [he] authorized".  (Compl. 32.)

On February 21, 2001, Alpert made comments at a GGGF board meeting, at which Gabelli was in attendance and also spoke, regarding the harm that "market-timing" or "scalping" was causing, as well as the specific actions that Gabelli Funds was taking to reduce market-timing activities in the fund.  (Compl. ¶

36; Sherman Decl., Ex. D).  These comments were similar in substance to the December 15, 2000 internal memorandum.  (Compl. ¶ 36.)

On or about April 1, 2002, Alpert advised Headstart to reduce the amount of market-timing in GGGF because the high trading levels were in violation of federal securities laws. (Compl. ¶ 25.)  Gabelli subsequently sent an email to Alpert stating, "WHAT IS THE SITUATION WITH MARKET TIMER - I UNDERSTAND YOU TOLD HIM 'I SAID' IT WAS OK. . . VERY PAROCHIAL AND DESTRUCTIVE."  (Compl. 25.)  (emphasis and ellipsis in original). Albert responded, "I have always been opposed to the market timers in the fund.  I had a discussion with Najy Nassar that he should reduce his market timing activity to no more than 3% of the fund.  He was reluctant to do this except he reduced one account to 3% and still is using about 10% or $16 million.  I would like him out completely.  However, if he continues his participation in other products of the firm we should allow some monies to remain in the Mutual funds."  (Compl. 25.)

Thereafter, Headstart reduced the amount of money that it had invested in the hedge fund that Gabelli managed.  (Compl. ¶ 26.)  In an email, Gabelli stated that the investment was drawn down because Headstart "was reduced in [market] timing money in mutual funds."  (Compl. 26.)  Prior to August 31, 2002, at least

48 accounts were banned from trading in GGGF and at least $23,000,000.00 in purchases were rejected due to suspected market-timing. (Compl. ¶ 35.)

On August 7, 2002, the Chief Executive Officer of Gabelli Funds' parent company instructed that all market-timers playing the "international game" should be stopped. (Compl. ¶ 28.) Alpert then informed Headstart that it would no longer be permitted to market-time GGGF, and Headstart subsequently redeemed the rest of its investment in Gabelli's hedge fund. (Compl. 28.)

On September 3, 2003, the New York Attorney General announced an investigation into market-timing. (Compl. ¶ 43.) In response, Alpert posted a September 3, 2003 Memorandum to the Gabelli Funds' parent company's website, stating that, "for more than two years, scalpers have been identified and restricted or banned from making further trades. Purchases from accounts with a history of frequent trades were rejected. Since August 2002, large transactions in the global, international and gold funds have been rejected without regard to the past history. While these procedures were in place they did not completely eliminate all timers." (Compl. ¶ 44; Sherman Declaration, Ex. E.)

On May 4, 2007 Alpert, by his attorney, entered into a tolling agreement with the SEC, which was amended on September

14, 2007, extending the statute of limitations in this matter for approximately seven months.  (Sherman Decl., Ex. G.)   The Complaint in this matter was filed on April 24, 2008.


## II. DISCUSSION

A.   Legal Standard for a Motion to Dismiss

For a complaint to survive dismissal under Rule 12(b)(6), the plaintiff must plead "enough facts to state a claim to relief that is plausible on its face."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility," the Supreme Court has explained,

> "when the plaintiff pleads factual content that allows
> the court to draw the reasonable inference that the
> defendant is liable for the misconduct alleged.   The
> plausibility standard is not akin to a 'probability
> requirement,' but it asks for more than a sheer
> possibility that a defendant has acted unlawfully.
> Where a complaint pleads facts that are 'merely
> consistent with' a defendant's liability, it 'stops
> short of the line between possibility and plausibility
> of 'entitlement to relief.'"

Ashcroft v. Iqbal, 129 S.Ct. 1937, 1949 (2009) (quoting Twombly, 550 U.S. at 556-57).  "[A] plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  Twombly, 550 U.S. at 555 (internal

quotation marks omitted).  "In keeping with these principles,"
the Supreme Court has stated:

> "a court considering a motion to dismiss can choose to
> begin by identifying pleadings, that because they are
> no more than conclusions, are not entitled to the
> assumption of truth.  While legal conclusions can
> provide the framework of a complaint, they must be
> supported by factual allegations.  When there are well-
> pleaded factual allegations, a court should assume
> their veracity and then determine whether they
> plausibly give rise to an entitlement to relief."

Iqbal, 129 S.Ct. at 1950.

In ruling on a 12(b)(6) motion, a court may consider the
complaint as well as "any written instrument attached to the
complaint as an exhibit or any statements or documents
incorporated in it by reference."  Zdenek Marek v. Old Navy
(Apparel) Inc., 348 F.Supp. 2d 275, 279 (S.D.N.Y. 2004) (citing
Yak v. Bank Brussels Lambert, 252 F.3d 127, 130 (2d Cir. 2001)
(internal quotations omitted)).

Under Rule 9(b), "in alleging fraud or mistake, a party must
state with particularity the circumstances constituting fraud or
mistake."  Fed. R. Civ. Pro. 9(b).  To satisfy the particularity
requirement of Rule 9(b), a complaint must "specify the
statements that the plaintiff contends were fraudulent, (2)
identify the speaker, (3) state where and when the statements
were made, and (4) explain why the statements were fraudulent."
United States Fire Ins. Co. v. United Limousine Service, Inc.,

303 F.Supp.2d 432 (S.D.N.Y. 2004) (citing Cosmas v. Hassett, 886 F.2d 8, 11 (2d Cir. 1989)).


B.    Statute of Limitations

      1.    The Applicable Limitations Period

      While "[a]n action on behalf of the United States in its governmental capacity . . . is subject to no time limitation, in the absence of congressional enactment clearly imposing it," SEC v. Tandem Management Inc., 2001 WL 1488218, * (S.D.N.Y. Nov. 21, 2001) (quoting E.I. Dupont De Nemours & Co. v. Davis, 264 U.S. 456, 462 (1924)), 28 U.S.C. § 2462 "is a general statute of limitations, applicable . . . to the entire federal government in all civil penalty cases, unless Congress specifically provides otherwise."   3M Co. (Minnesota Min. and Mfg.) v. Browner, 17 F.3d 1453 (D.C. Cir. 1994) (emphasis added).

      Section 2462 provides that "an action, suit or proceedings for the enforcement of any civil fine, penalty, or forfeiture, pecuniary or otherwise, shall not be entertained unless commenced within five years from the date when the claim first accrued. Therefore, to the extent the Commission's claims are subject to a statute of limitations, the catch-all limitations period in 28 U.S.C. § 2462 applies."   S.E.C. v. Jones, 476 F.Supp.2d 374, 380 (S.D.N.Y. 2007).  However, courts have found that in light of

10

"the ordinary meaning of 'penalty,' and the clear language of §
2462 . . . the limitations period in § 2462 applies to civil
penalties and equitable relief that seeks to punish, but does not
apply to equitable relief which seeks to remedy a past wrong or
protect the public from future harm." Id. at 380-81 (citing
Johnson v. SEC, 87 F.3d 484, 486-92 (D.C. Cir. 1996); SEC v.
Tandem Mgmt. Inc., 2001 WL 1488218, at *6 (S.D.N.Y. Nov. 21,
2001)). In particular, "Section 2462's statute of limitations
applies to the SEC's request for civil penalties but not to its
request for permanent injunctive relief [or] disgorgement." SEC
v. Kelly, 663 F.Supp.2d 276, 287 (S.D.N.Y. 2009); see also
Johnson, 87 F.3d at 491 (§ 2462 does not apply to the remedy of
disgorgement).

Accordingly, to the extent the SEC seeks to enjoin
Defendants Alpert and Gabelli from violating or aiding and
abetting the violation of the securities laws, or an order
directing Defendants to disgorge profits, (Compl. ¶ 59(A)-(C)),
in order to remedy an alleged past wrong and protect the public
from future harm, the five-year statute of limitations of § 2462
does not apply. Nevertheless, the SEC also seeks an Order
directing Defendants to pay civil monetary penalties, (Compl. ¶
59(D)), which is clearly subject to § 2462 under the language of
the statute.

11

Plaintiff contends that a claim accrues and the statute of limitations begins to run for purposes of § 2462, when the fraud or misstatement is discovered. The "discovery rule," when applicable, provides that a cause of action accrues when the violation was discovered or should have been discovered by Plaintiff, rather than when the violation occurs. See, e.g., S.E.C. v. Alexander, 248 F.R.D. 108, 116 (E.D.N.Y. 2007). Although the Second Circuit has not addressed the issue, other courts both within and outside this jurisdiction have found that the discovery rule does not apply to § 2462. See, e.g., 3M Co. v. Browner, 17 F.3d 1453, 1463 (D.C. Cir. 1994) (rejecting the discovery rule as "unworkable; outside the language of the statute; [and] inconsistent with judicial interpretations of § 2462"); Alexander, 248 F.R.D. at 116 (collecting cases holding that a "claim for penalties subject to Section 2462 accrues at the time the violation giving rise to the penalties occurs"); S.E.C. v. Jones, 2006 WL 1084276, *6 (S.D.N.Y. Apr. 25, 2006) (finding the analysis in Browner instructive and rejecting the applicability of the discovery rule to claims subject to § 2462). This Court agrees and finds that the discovery rule does not apply to claims subject to the limitations of § 2462.

12

    2.    Application of the Limitations Period to the Alleged
Violations.

Here, the Exchange Act claims are based upon Alpert's
September 3, 2003 Memorandum and an alleged "scheme to defraud"
through the hiding of Headstart's market timing from the GGGF
Board. (Compl. ¶ 44; Plt's Mem. of Law, 11-13.)  Because the
April 24, 2008 Complaint in this matter was filed within five
years of September 2, 2003, Plaintiff's request for civil
penalties under § 2462 for the alleged September 3, 2003
misrepresentation and omission is not barred, although for the
reasons explained, <u>infra</u>, those claims are dismissed because
Plaintiff cannot plead all the necessary elements of a cause of
action.  As to Alpert's December 15, 2000 memorandum stating that
market-timers were being identified and restricted, (Compl. ¶
31), his December 2000 instructions to "market-time police"
employees to leave Headstart alone, (Compl. ¶¶ 31-33), and his
February 21, 2001 report to the GGGF Board that market-timing was
being restricted, (Compl. ¶¶ 36-38), the April 24, 2008 Complaint
was filed well more than five years and seven months after these
alleged violations.

For the Aiding and Abetting claims under Sections 206(1) and
206(2) of the Investment Advisers Act, the Complaint alleges that
Headstart's market timing ended on August 7, 2002. (Compl. ¶ 44.)

13

Accordingly, for Defendant Alpert, the statute of limitations on a claim for civil penalties under the Investment Advisers Act had run by March 7, 2008, five years and seven months after the violation occurred, and prior to the filing of the Complaint on April 23, 2008.  Similarly, for Defendant Gabelli, the statute of limitations on the Investment Advisers Act claims ran on August 7, 2007, well before the Complaint was filed.

Accordingly, the statute of limitations has run on Plaintiff's claims for civil penalties under the Investment Adviser Act and the alleged scheme to defraud under the Exchange Act.

3.    Fraudulent Concealment

Plaintiff also contends, however, that the statute of limitations was tolled by Defendants' alleged fraudulent concealment, which courts in this jurisdiction have found to apply to claims subject to § 2462.  See S.E.C. v. Power, 525 F.Supp.2d 415, 424-35 (S.D.N.Y. 2007); S.E.C. v. Jones, 2006 WL 1084276, *6 (S.D.N.Y. Apr. 25, 2006).

To invoke the fraudulent concealment doctrine, a Plaintiff must allege: "(1) that the defendants concealed the cause of action; (2) that the plaintiff did not discover the cause of action until some point within five years of commencing the

14

action; and (3) that the plaintiff's continuing ignorance was not attributable to lack of diligence on its part." Power, 525 F.Supp.2d at 424 (citing New York v. Hendrickson Bros., Inc., 840 F.2d 1065, 1083 (2d Cir. 1988)). "Plaintiff can establish the concealment element by pleading either that the Defendants took affirmative steps to prevent discovery of the fraud or that the wrong itself was . . . self-concealing." Power, 525 F.Supp.2d 415 (quoting Jones, 2006 WL 1084276, at *6).

The doctrine of fraudulent concealment does not apply "where the misrepresentation or act of concealment underlying the estoppel claim is the same act which forms the basis of plaintiff's underlying cause of action." Abercrombie v. Andrews College, 438 F.Supp.2d 243, (S.D.N.Y. 2006). Further, "[s]tanding alone, allegations of fraud are generally insufficient to demonstrate that a particular act is self-concealing. Indeed, for a fraud to be self-concealing, the defendant must have engaged in some misleading, deceptive or otherwise contrived action or scheme, in the course of committing the wrong, that was designed to mask the cause of action." SEC v. Jones, 476 F.Supp.2d 374, 382 (S.D.N.Y. 2007) (emphasis in original) (quoting Hobson v. Wilson, 737 F.2d 1, 34 (D.C. Cir. 1984)).

15

Here, Plaintiff pleads that it "could not have discovered that wrongdoing earlier because Defendants took affirmative acts to conceal it, and because of the self-concealing nature of Defendants' wrongdoing." (Compl. ¶ 46.)  Here, Plaintiff does not allege with particularity under Rule 9(b) what acts Defendants took, beyond the alleged acts of wrongdoing themselves, or what contrivance or scheme was designed to mask the SEC's causes of action.  Nor does Plaintiff meet the third element of fraudulent concealment by alleging how it has engaged in due diligence during the time that the statute of limitations was running.

Accordingly, because the statute of limitations has run on Plaintiff's claims for civil penalties under the Investment Adviser Act and the alleged scheme to defraud under the Exchange Act, these claims are DISMISSED.

C.   Section 10(b) & Rule 10b-5 and 17(a) Claims Against Defendant Alpert

To state a cause of action under Section 10(b) and Rule 10b-5, a Plaintiff must allege "(1) material misstatement or omission, (2) scienter, (3) a connection with the purchase or sale of a security, (4) reliance . . . , (5) economic loss, and (6) loss causation, i.e., a causal connection between the

16

material misrepresentation and the loss." <u>In re Salomon Analyst Metromedia Litigation</u>, 544 F.3d 474, 478 n.1 (2d Cir. 2008) (citing <u>Dura Pharms., Inc. v. Broudo</u>, 544 U.S. 336, 341 (2005)).

To allege a claim under Sections 17(a)(1),(2), and (3), Plaintiff "must show that the defendant: (1) committed a deceptive or manipulative act, or made a material misrepresentation (or a material omission if the defendant had a duty to speak) or used a fraudulent device; (2) with scienter; (3) which affected the market for securities or was otherwise in connection with their offer, sale or purchase." <u>SEC v. Power</u>, 525 F.Supp.2d 415, 419 (S.D.N.Y. 2007) (citing <u>SEC v. Monarch Funding Corp.</u>, 192 F.3d 295, 308 (2d Cir. 1999)).  However, "[w]hile proof of scienter is a necessary element of liability under . . . § 17(a)(1) and . . . § 10(b) and Rule 10b-5, it is not required for liability under § 17(a)(2)&(3)." <u>Id.</u> (citing <u>Aaron v. SEC</u>, 446 U.S. 680, 697 (1980)).

Here, Plaintiff alleges that Alpert violated Section 10(b)(5), Rule 10b-5 and Section 17(a) by both misstating and omitting material facts in his September 2003 memorandum and by engaging in a scheme to defraud, which consisted of authorizing Headstart to market-time GGGF in exchange for an investment in Gabelli's hedge fund while hiding these facts from GGGF's Board of Directors.  (Compl. ¶¶ 36, 38, 44-45, 49-50, 52-53; Plt's Mem.

of Law, 11-14.)   In response, Defendant Alpert argues that the
SEC's Complaint does not allege with sufficient particularity
that Alpert made a misrepresentation or actionable omission, that
any such misrepresentation or omission was material, that Alpert
engaged in a scheme to defraud, or that Alpert acted with the
requisite scienter.   (Alpert's Mem. of Law, 12-20.)

Plaintiff alleges that Alpert made a misstatement in his
September 2003 memorandum to the Gabelli Fund's parent's website,
stating that "for more than two years, scalpers have been
identified and restricted or banned from making further trades."
(Compl. ¶¶ 43-45.)   The Court finds that this statement was
literally true, given that for more than two years, scalpers had
been identified and restricted from making further trades.
(Compl. ¶¶ 30-31, 33-35.)

Further, Plaintiff's sole basis for its material omission
claim is Alpert's alleged duty to correct the statement that "for
more than two years, scalpers have been identified and restricted
or banned from making further trades." (Compl. ¶¶ 43-45.)
However, as the Court has found, this statement was not a
misrepresentation, and thus Alpert had no duty to disclose fully
Headstart's market-timing in the September 3, 2003 memorandum.

Plaintiff also fails to allege that Alpert participated in a
fraudulent scheme or artifice.   To "participate in a fraudulent

18

scheme" a Defendant must do more than "perform[] purely administrative duties without knowledge of the purpose of the scheme" but must "take . . . concrete steps in furtherance of the violation" by engaging in "actions or statements that were independently deceptive or fraudulent."   <u>SEC v. Collins & Aikman Corp.</u>, 524 F.Supp.2d 477, 486 (S.D.N.Y. 2007).

Under the securities laws, however, a "market timing agreement . . . standing alone, [can] not be considered <u>per se</u> a fraudulent device intended to defraud investors."   <u>SEC v. PIMCO Advisors Fund Management LLC</u>, 341 F.Supp.2d 454, 468 (S.D.N.Y. 2004).   Further" while "[a]rguably . . . [such an] agreement, in which [an investor] received favorable treatment in exchange for its placement of long-term investments in various . . . Funds, violated . . . fiduciary duties towards investors, . . . such potential violations do not by themselves result in violations of Rule 10b-5."   <u>Id.</u>, 469.   Here because Defendant Alpert permitted Headstart to engage in a practice that was not fraudulent, and did not mislead investors, Plaintiff has not adequately alleged a fraudulent scheme or device intended to defraud investors.

Accordingly, because Plaintiff has not pled with particularity a material misrepresentation, omission, or fraudulent scheme or artifice, Defendant Alpert's Motion to

19

Dismiss the Section 10(b), Rule 10b-5 and 17(a) claims is GRANTED.


D.   Section 206 Aiding and Abetting Claim Against Defendants
     Alpert and Gabelli

     To state a cause of action for aiding abetting liability

under Sections 206(1) and 206(2) of the Investment Advisers Act,

Plaintiff must allege (1) an underlying violation of the act; (2)

Defendant's knowledge of the fraudulent acts; and (3) Defendant's

provision of substantial assistance to the primary violation.

See SEC v. Cedric Kushner Promotions, Inc., 417 F.Supp.2d 326,

334 (S.D.N.Y. 2006); SEC v. Pimco Advisors Fund Management LLC,

341 F.Supp.2d 454, 470 (S.D.N.Y. 2004).  The elements of a

primary violation of Section 206(1) and (2) "have been

interpreted as substantively indistinguishable from Section 17(a)

of the Securities Act, except that Section 206(1) requires proof

of fraudulent intent, while Section 206(2) simply requires proof

of negligence by the primary wrongdoer."  Pimco Advisors Fund

Managmenet LLC, 341 F.Supp.2d at 470 (citing SEC v. Moran, 922

F.Supp. 867, 896-97 (S.D.N.Y. 1996)).

     "As [the Second Circuit] and the Supreme Court have noted,

the Advisers Act reflects . . . congressional intent to

eliminate, or at least to expose, all conflicts of interest which

20

might incline an investment adviser - consciously or
unconsciously - to render advice which was not disinterested."
SEC v. DiBella, 587 F.3d 553, 567 (2d Cir. 2009) (quoting SEC v.
Capital Gains Research Bureau, Inc., 375 U.S 180, 186 (1963)).
To that end, Section 206 has been found to "establish federal
fiduciary standards to govern the conduct of investment advisers
. . . requiring advisers to exercise the utmost good faith in
dealing with clients, to disclose all material facts, and to
employ reasonable care to avoid misleading clients."  SEC v.
Treadway, 430 F.Supp.2d 293, 338 (S.D.N.Y. 2006)(quoting
Transamerica Mortgage Advisors, Inc. v. Lewis, 44 U.S. 11, 17
(1979); Moran, 922 F.Supp. at 895-96)).

    Here, the alleged primary violator is Gabelli Funds, LLC,
which Defendants do not contest meets the definition of an
Investment Adviser to the GGGF Fund under the Investment Advisers
Act.  Plaintiff has adequately alleged that Gabelli Funds
knowingly entered into an agreement with Headstart permitting it
to market-time GGGF in exchange for investment in an affiliated
hedge fund, (Compl. ¶¶ 20-24), at the same time that Gabelli
Funds had acknowledged that market-timing was harmful to long-
term investors in the GGGF, (Compl. ¶¶ 31, 34).  Taking these
facts as true, Plaintiff has alleged with particularity a

violation of Gabelli Funds' fiduciary duty to its investors under both Section 206(1) and (2).

Further, Plaintiff adequately pleads that Defendant Gabelli knew or was reckless in not knowing of Gabelli Funds' violation of the Investment Advisers Act, and provided substantial assistance to that violation. In particular, Plaintiff alleges that Gabelli himself entered into the market-timing agreement with Headstart, permitted Headstart to increase its market-timing trading, made clear that no one would be permitted to market-time GGGF unless he authorized it, was informed by Alpert of Headstart's continued market-timing in GGGF, and was present at Alpert's allegedly misleading presentation to the Board of the GGGF. (Compl. ¶¶ 20-23, 25-26, 32, 36-37.) Similarly, Plaintiff has pled with particularity that Alpert knew of and provided substantial assistance to Gabelli Funds' violation, including by providing the "ground rules" for market-timing to Headstart, directing "market-time police" employees not to monitor Headstart's trades because they were related to Gabelli's client relationship, and omitting the existence of Headstart's market-timing while representing to the Board of Directors of GGGF that management was taking steps to restrict market-timing. (Compl. ¶¶ 20, 31, 36, 43-45.)

Accordingly, Defendants' Motions to Dismiss the Aiding and Abetting claims under Sections 206(1) and (2) of the Investment Adviser Act are DENIED.

E.    Available Remedies

Defendants further argue that, separate and apart from their statute of limitations arguments, the remedies of disgorgement, injunctive relief, and civil monetary penalties are unavailable to the SEC as a matter of law.

1.    Injunctive Relief

First, Defendants contend that injunctive relief is unavailable because the SEC has not adequately pled scienter or "demonstrated any realistic likelihood of recurrence." (Alpert Mem. of Law, 24; Gabelli Mem. of Law, 15.) As the Court found, supra, the SEC has adequately alleged the element of scienter for each of its claims. In determining whether injunctive relief is available in an action under the Exchange Act, "[t]he focus of this inquiry is on the defendant's past conduct." SEC v. Colonial Investment Management, LLC, 2008 WL 2191764, *3 (S.D.N.Y. 2008) (quoting SEC v. Commonwealth Chem. Sec., Ins., 574 F.2d 90, 99 (2d Cir. 1978)). "Other factors courts should consider in determining whether there is a reasonable likelihood

23

of future violations include: (1) the egregiousness of the past violations; (2) the degree of scienter; (3) the isolated or repeated nature of the violations; (4) whether defendant has accepted blame for his conduct; and (5) whether the nature of the defendant's occupation makes it likely he will have opportunities to commit future violations."   Id. (citing SEC v. Cavanagh, 155 F.3d 129, 135 (2d Cir. 1998)).

Although the SEC has pled that "unless restrained and enjoined" Defendants "will continue to violate" Sections 206(1) and (2) of the securities laws, (Compl. ¶ 57), its allegations do not plausibly allege a reasonable likelihood that the Defendants will engage in future violations.  There is no allegation that either Defendant has ever engaged in a breach of fiduciary duty or other fraudulent activity either prior or subsequent to the specific claims brought here.  Further, Plaintiff does not allege how Defendants' acts are particularly egregious, and even concedes that any market-timing was not, by itself, fraudulent or illegal.  (Plt's Mem. Of Law, 9.)   Further, the Court notes that when the Defendants were instructed by their parent company to stop all market-timing, the Defendants ended Headstart's market-timing in August of 2002 and the Attorney General began his investigation into market-timing in September of 2003.  (Compl. ¶¶ 28, 45.)

24

Additionally, the Court finds the facts alleged here to be quite different from those where other Courts have denied motions to dismiss injunctive relief under the securities laws.  See, e.g., SEC v. Colonial Investment Management LLC, 2008 WL 2191764, *3 (S.D.N.Y. May 23, 2008) (denying Motion to Dismiss where it was alleged that "defendants repeatedly [on eighteen separate occasions] and knowingly engaged in conduct that violated [securities laws] over a period of several years, and engaged in sham transactions to conceal the violative conduct.); SEC v. Power, 525 F.Supp.2d 415, (S.D.N.Y. 2007) (denying Motion to Dismiss where it was alleged that defendant "engaged in repeated fraudulent conduct . . . and knowing misconduct over a period of several years" including the creation of sham transactions, improperly writing off assets, improperly valuing inventory, falsely increasing a company's performance through the improper consolidation of revenues, and improperly directing the establishment of reserves on a worst-case basis).

Accordingly, the Court finds that Plaintiff has not plausibly alleged that Defendants are reasonably likely to engage in future violations under the Investment Advisors Act, and that the Defendants' motion for dismissal of Plaintiff's request for an injunction is GRANTED.

25

### 2.   Disgorgement

Second, Defendants contend that disgorgement is unavailable because the SEC has failed to allege that it is necessary to deter future wrongdoing or that Defendants were unjustly enriched, (Alpert Mem. of Law, 24), and because Gabelli Funds has already paid disgorgement, (Gabelli Mem. of Law, 14.)  "In a securities enforcement action, as in other contexts, disgorgement is not available primarily to compensate victims" but "[i]nstead . . . to prevent wrongdoers from unjustly enriching themselves through violations, which has the effect of deterring subsequent fraud."  SEC v. Cavanagh, 445 F.3d 105, 117  (2d Cir. 2006).  Thus, the fact that Gabelli Funds has already disgorged profits does not prevent the SEC from seeking disgorgement from Alpert and Gabelli for purposes of preventing any unjust enrichment accruing to them and for deterrence.  The SEC adequately alleges that the remedy of disgorgement is necessary to prevent Defendants from enriching themselves through their "ill-gotten gains from their illegal conduct . . . "  (Compl. ¶ 59(c)).

### 3.   Civil Penalties

Finally, Defendants contend that the SEC cannot seek civil monetary penalties from aiders and abettors under the Investment Advisers Act. (Gabelli Mem. of Law, 15.)  Although the Court has

26

found that Plaintiff may not seek civil penalties for its

Investment Advisers Act claims under the statute of limitations,

in the alternative, the Court also agrees that the Investment

Advisers Act does not provide for civil penalties for aiders and

abettors. Section 209(e) of the Investment Advisers Act provides

that:

> Whenever it shall appear to the Commission that any
> person has violated any provision of [the Act] . . .
> the Commission may bring an action in a United States
> district court to seek, and the court shall have
> jurisdiction to impose, upon a proper showing, a civil
> penalty to be paid by the person who committed such a
> violation.

15 U.S.C. § 80b-9(e)(1) (emphasis added).

Where the "statutory language is unambiguous, in the absence

of a clearly expressed legislative intent to the contrary, that

language must ordinarily be regarded as conclusive." Reves v.

Ernset & Young, 507 U.S. 170, 177 (1993). Here, the statutory

language is unambiguous that civil penalties in judicial

proceedings may be imposed only upon a "person who committed" a

violation of the Investment Advisers Act.

Further, "[w]here Congress includes particular language in

one section of the statute but omits it in another section of the

same Act, it is generally presumed that Congress acts

intentionally and purposely in the disparate inclusion or

exclusion." Russello v. U.S, 464 U.S. 16, 23 (2000). Here,

Section 209(e) of the Investment Advisers Act as it now exists was amended by Section 402 of the Securities Enforcement Remedies and Penny Stock Act of 1990 (the "Remedies Act"), Pub. L. No. 101-429, 104 Stat. 931, 949-51. (See Gabelli Mem. of Law, 16 n.17).   An additional provision of the Remedies Act - Section 401 - provides that in administrative proceedings, "the Commission may impose a civil penalty if it finds . . . that such person . . . has willfully aided, abetted, counseled, commanded, induced, or procured such a violation by any other person."   15 U.S.C. § 80b-3(I).   Consequently, it is apparent that had Congress wished to provide for civil monetary penalties for aiders and abetters in judicial proceedings under the Investment Advisers Act, it would have done so through the use of similar language as it used to provide for such penalties in administrative proceedings under the Act.

Further, Plaintiffs's argument for why the Court should disregard both the ordinary meaning of the statutory language of Section 209(e) and the express provision of civil penalties for aiders and abetters under Section 401 of the Remedies Act is not based upon a "clearly expressed legislative intent to the contrary," Reves v. Ernset & Young, 507 U.S. at 177.   Instead, the SEC relies upon the legislative history of the entirely distinct Exchange Act to argue by analogy that the term "violation" as used

28

in Section 209(e) of the Investment Advisers Act should be interpreted as including both primary and aiding and abetting violations.

As the Court in SEC v. Bolla, 550 F.Supp.2d 54, (D.D.C. 2008) stated, the "SEC's argument fails, however, because . . . [it] does not discuss the Advisers Act at all, and thus does not directly bear upon Congress' view of the SEC's ability to seek monetary penalties against aiders and abetters in enforcement actions under the Advisers Act."  Id., 61.

The Court agrees with the Court in Bolla, which found that because "the SEC offers no convincing rationale for ignoring the Supreme Court's instructions and the canons of statutory construction . . . Section 209(e) does not authorize the SEC to seek, or grant this Court jurisdiction to impose, monetary penalties upon Defendant . . . for his aiding and abetting of the Advisers Act."  Id., 62-63.

Accordingly, Defendants' Motions to Dismiss the request for disgorgement is DENIED, while Defendants' Motions to Dismiss the request for an injunction, and for civil penalties under the Investment Advisers Act is GRANTED.

### III. CONCLUSION

For the foregoing reasons, Defendants' Motions to Dismiss the Complaint are GRANTED in part, and DENIED in part.  Plaintiff's claims under Section 10(b) and Rule 10b-5, as well as Section 17 of the Exchange Act are DISMISSED, with prejudice.  Plaintiff's requests for an injunction and for civil monetary penalties under the Investment Advisers Act are DISMISSED, with prejudice. Defendants shall Answer the remaining claim for disgorgement under the Investment Advisers Act within 30 days of the date of this Order.

SO ORDERED.

DATED:  New York, New York
        March 17, 2010

                         Deborah A. Batts
                   United States District Judge